CHARLES R. SMITH v. STATE OF MISSISSIPPI.

[49 South. 945.]

1. CRIMINAL LAW AND PROCEDURE. *Murder. Insanity. Evidence.*

Where, in a prosecution for homicide, defendant's excuse was delusional insanity, evidence concerning his conduct in several fights in which he had been previously engaged with various persons when there was no pretense that he was not sane was relevant.

2. SAME. *Same. Test of insanity.*

Where, in a prosecution for homicide, the defense is insanity, total or partial, the test of defendant's criminal responsibility is his ability at the time he committed the act to recognize and appreciate the nature and quality thereof and his ability to distinguish right from wrong, and this notwithstanding it is claimed that his act resulted from an uncontrollable impulse called moral, emotional, impulsive, or paroxysmal insanity.

3. SAME. *Misconduct of audience.*

In a prosecution for homicide, it will be presumed, in the absence of a clear showing to the contrary, that the jury were not ininfluenced by demonstrations and misconduct of bystanders which the judge attempted promptly to suppress, and that defendant was not prejudiced thereby.

4. SAME. *Excluding expert witnesses from courtroom. Harmless error. Appeal.*

In a prosecution for homicide accused was not prejudiced by the court's error in excluding certain alienists who were to testify in his behalf from the courtroom while the witnesses other than accused and his daughter were testifying.

FROM the circuit court of Lowndes county.

HON. JOHN L. BUCKLEY, Judge.

Smith, appellant, was indicted, tried and convicted of murder, sentenced to the penitentiary for life and appealed to the supreme court. The judges were not unanimous in their conclusions touching the facts. The opinion in chief sufficiently states the facts as ascertained from the record by a majority of the court to render a further statement by the reporter unnecessary to a comprehension of the principles decided. The chief justice dissented from some of the findings of fact by the other judges, as shown by his dissenting opinion.

SMITH, J., delivered the opinion of the court.

Defendant was convicted in the court below of murder, sentenced to life imprisonment in the state penitentiary, and appeals to this court. His defense was delusional insanity; the particular delusion being that his daughter had been debauched by Laurent, the man whom he killed. One of the assignments of error is that the verdict was not warranted by the evidence. The testimony in this case is so voluminous that an intelligent review of the same would require a volume in itself and would serve no good purpose; suffice it to say that on the evidence the question of defendant's criminal responsibility was for the jury, and, unless some error of law was committed prejudicial to the defendant, the verdict, of course, must stand.

On the cross-examination of the defendant he was asked, and permitted to testify over his objection, to his conduct in several fights which he had had with various parties at various times, when there was no pretense of his not being sane. Other witnesses testified, over defendant's objection, to this conduct also. This action of the court is also assigned as error. This evidence was relevant to the issue and perfectly competent. Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence. 1 Wig-

more on Evidence, § 228, and authorities there cited; *State v. Jones,* 50 N. H. 369, 9 Am. Rep. 242.

The twentieth instruction asked by the defendant was as follows: "If from the evidence the jury believe that, at the time of the killing, the defendant honestly and in good faith believed that deceased had seduced and ruined his only daughter, and that such belief on the part of the defendant had no foundation in truth and fact, and that on the occasion of the killing the defendant, on meeting the deceased, was seized with an insane and irresistible impulse to kill him because he believed that the deceased had seduced and ruined his only daughter, and that the defendant's act in killing deceased was the direct result of said uncontrollable impulse, springing from a mental disease, existing to so high a degree that for the time being it overwhelmed the reason, judgment, and conscience of the defendant, then he is not guilty, and the jury will acquit." This instruction was modified by adding after the word "defendant" and before the word "then" in the last line the words "that he was unable to distinguish moral right from wrong." And this action of the court is assigned as error.

Where the defense is insanity, total or partial, the test of the defendant's criminal responsibility is his ability, at the time he committed the act, to realize and appreciate the nature and quality thereof—his ability to distinguish right and wrong. *Grissom v. State,* 62 Miss. 169. And the test is the same where the defense is that the act was the result of an uncontrollable impulse caused by any species of insanity. This is distinctly held in *Commonwealth v. Rogers,* 7 Metc. (Mass.) 500, 41 Am. Dec. 458, and *Cunningham v. State,* 56 Miss. 269, 21 Am. Rep. 360, so much relied upon by the appellant, and the reasons therefor clearly set forth.

Uncontrollable impulse as a defense when the defendant is able to distinguish right from wrong was in the *Cunningham case* repudiated in the following language: "But there is said to be an uncontrollable impulse springing from a mental con-

dition quite different from this, a state of the mind which perfectly perceives the true relations of the party and recognizes all the obligations thereby imposed, but which, it is said, is unable to control the will. This character of insanity is variously styled moral, or emotional, or impulsive, or paroxysmal insanity. It is known among medical writers as lesion of the will. Its peculiarity is said to be that, while the mental perception is unimpaired, the mind is powerless to control the will; that while its unhappy subject knows the right, and desires to pursue it, some mysterious and uncontrollable impulse compels him to commit the wrong. This kind of insanity, if insanity it can be called, though sometimes recognized by respectable courts, and still oftener, perhaps, by juries seeking an excuse to evade the stern dictates of the law, is properly rejected by the authorities generally. The possibility of the existence of such a mental condition is too doubtful, the theory is too problematical, and too incapable of a practical solution, to afford a safe basis of legal adjudication. It may serve as a metaphysical or psychological problem to interest and amuse the speculative philosopher, but it must be discarded by the jurist and the lawgiver in the practical affairs of life. To it may well be applied the language of Judge CURTIS, who, in speaking of this and similar questions, says: 'They are an important, as well as a deeply interesting, study, and they find their place in that science which ministers to diseases of the mind. . . . But the law is not a medical nor a metaphysical science. Its search is after those practical rules which may be administered without inhumanity, for the security of civil society by protecting it from crime.' " It is true that in that case it was also held that an uncontrollable impulse springing from mental disease existing to so high a degree that for the time it overwhelmed the reason, judgment, and conscience would excuse the commission of crime. Where a person's reason, judgment, and conscience is overwhelmed, it is utterly impossible, of course, for him to distinguish the right and wrong of a matter.

In *Commonwealth v. Rogers, supra,* Shaw, C. J., said: "A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act, and its consequences; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that, if he does the act, he will do wrong and receive punishment—such partial insanity is not sufficient to exempt him from responsibility for criminal acts."

Our interpretation of these cases is sustained by many high authorities, among whom are Mr. Bishop. In his work on Criminal Law (8th ed.) vol. 1, § 383b, Mr. Bishop says: "But many seem to maintain that if one is so disordered mentally as, while intellectually comprehending right and wrong, and knowing an act to be forbidden and punishable by the law, to be still unable to adjust his conduct to the law and avoid doing the forbidden thing, he is to be punished if he does it, the same as though he was sane," citing in support thereof, among other authorities, the *Cunningham case.* And again, in section 384, he says: "It is not in all the cases absolutely clear what, of the language addressed to the jury, is meant for pure law, and what of it is for mere practical suggestion. But either as the one or the other, the jury in the greater number of the cases are in substance directed to consider whether, when the prisoner committed the act, he was in a state to comprehend his relations to others, the nature of the thing done, and its criminal character

against, what he is presumed to know, the law of the land; or, in another form of words, regarded as in effect the same, whether in what he did he was of capacity to be conscious of doing wrong; or, in still other language, whether he could distinguish between right and wrong with reference to what he was doing." In support thereof he cites many authorities, among them being *Commonwealth v. Rogers, supra,* and *Grissom v. State,* 62 Miss. 167.

In this last-cited case CHALMERS, J., author of the opinion in the *Cunningham case,* said: "The test with us in this class of cases is the capacity to distinguish between right and wrong, and we know no difference in this regard between total and partial insanity." In *People v. Hubert,* 119 Cal. 223, 51 Pac. 331, 63 Am. St. Rep. 77, it is said: "It must be held that, conceding that the act was the offspring of an irresistible impulse because of mental disease, still the defendant must be held responsible if he at the time had the requisite knowledge·as to the nature and quality of the act and of its wrongfulness. We do not know that the impulse was irresistible, but only that it was not resisted. Whether irresistible or not must depend upon the relative force of the impulse and the restraining force, and it has been well said to grant immunity from punishment to one who retains sufficient intelligence to understand the consequences to him of a violation of the law may be to make an impulse irresistible which before was not. . . . Lord Bromwell, in a discussion of this subject, related a case in which a witness, to prove that a prisoner was so afflicted, related that he had once become violent and killed a cat, and said he believed the impulse could not be resisted by the defendant. His lordship asked if he thought he would have killed the cat if a policeman had been present. The witness answered, 'No.' His lordship then said he supposed the impulse was irresistible only in the absence of a policeman."

The modification of this instruction was entirely proper. It simply made plain to the jury of unprofessional men what the

instruction without the modification imported to the professional mind. Without it, the jury might have understood that if the defendant acted under an uncontrollable impulse, knowing that he was doing wrong, he was not guilty. It is true that in some jurisdictions uncontrollable impulse constitutes a complete defense to a person charged with the commission of a crime. But "there is no question," as stated in Wharton and Styles' Medical Jurisprudence, vol. 1, § 192, "that the position that an irresistible impulse can be a defense is inconsistent with the rule laid down in the great body of cases which sustain the 'right and wrong' test as a conclusive standard." The ground upon which the "right and wrong" test is repudiated in some jurisdictions, where an uncontrollable impulse is involved, is, of course, necessity and compulsion. As expressed by one writer: "No action can be criminal if it is not possible for a man to do otherwise. An unavoidable crime is a contradiction; whatever is unavoidable is no crime, and whatever is a crime is not unavoidable." Mr. Bishop admits this in section 383b of the first volume of his work on Criminal Law. From this it logically follows that the uncontrollable impulse, the necessity, the compulsion existing, the cause thereof, is immaterial, and there is no sound reason for a distinction between an uncontrollable impulse caused by a diseased mind and an uncontrollable impulse resulting from any other cause. Indeed, Mr. Bishop goes the full limit and holds that "one is insane who, from whatever cause, is incompetent to have the criminal intent, or who is incapable of so controlling his volitions as to avoid doing the forbidden thing." Of course, counsel here do not contend that this is, or ought to be, the law. The law is not an exact science. Many of its rules are imperfect, and it may be that the one now under consideration is imperfect, but the adoption of any other test of criminal responsibility would be impracticable, and would result in opening wide the door for the escape of criminals on the ground of uncontrollable impulse, irresistible inclination, etc.

In *Regina v. Barton,* 3 Cox, C. C. 275, cited in *United States v. Holmes,* 1 Cliff. 121, Fed. Cas. No. 15,382, the defense set up was that the prisoner had committed the crime under an irresistible impulse. Parke, Baron, is there quoted as having "told the jury that there was but one question for their consideration, and that was whether, at the time the prisoner inflicted the wounds that caused the death, he was in a state of mind to be made responsible for the crime. That would depend upon the question whether he at the time knew the nature and character of the deed he was committing, and, if so, whether he knew he was doing wrong in so acting. In the course of his remarks to the jury he expressed his decided concurrence in the view of the question previously taken by Baron Rolfe, that the excuse of an irresistible impulse, coexisting with the full possession of the reasoning powers, if allowed to be a sufficient defense, might be urged in justification of every crime known to the law; for every man might be said, and truly, not to commit any crime except under the influence of some irresistible impulse. That distinguished judge then went on to say that something more than this was necessary to justify an acquittal on the ground of insanity, and it would therefore be for the jury to say whether, taking into consideration all that the surgeon had said, which was entitled to great weight, the impulse under which the prisoner had committed this deed was one which altogether deprived him of knowledge that he was doing wrong.

Among the many authorities examined by us upon this subject, in addition to those hereinbefore cited, we refer to *Bovard v. State,* 30 Miss. 600; *Ford v. State,* 73 Miss. 734, 19 South. 665, 35 L. R. A. 117; *U. S. v. McGlue,* 1 Curt. 1, Fed. Cas. No. 15,679; *U. S. v. Holmes,* 1 Cliff. 98, Fed. Cas. No. 15,382; *State v. Harrison,* 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224; *Merritt v. State,* 39 Tex. Cr. R. 70, 45 S. W. 21; *Leache v. State,* 22 Tex. App. 279, 3 S. W. 539, 58 Am. Rep. 638; *State v. Mowry,* 37 Kan. 369, 15 Pac. 282; *McCarty v. Com-*

*monwealth,* 114 Ky. 620, 71 S. W. 656; *State v. Lewis,* 20 Nev. 333, 22 Pac. 241; *State v. O'Neil,* 51 Kan. 651, 33 Pac. 287, 24 L. R. A. 555; *State v. Levelle,* 34 S. C. 120, 13 S. E. 319, 27 Am. St. Rep. 799; *Guiteau's case* (D. C.) 10 Fed. 161.

What we have said with reference to the modification of defendant's twentieth instruction disposes of his objection to the state's fifth instruction. This trial continued over a period of several days, during the whole of which time there was a large audience present, the courtroom being packed to its full capacity. Complaint is made of the fact that this audience failed to observe the proprieties due on such an occasion, and demonstrated, in an audible manner, its approval of some things which occurred on the trial. The circuit judge seems to have tried to prevent this, and finally had a number of special deputies sworn in and placed in different portions of the room to preserve order. It would have been well had he exercised his power in this regard to the full extent; a few wholesome fines, or a clearing of the room of all persons who would not observe the proprieties, would have prevented any further disturbance. We cannot say that the defendant was prejudiced by this conduct of the audience. We must presume, in the absence of clear inference that the fact might be otherwise, that the jury were common-sense men, observed their oaths, and tried the case on the law and the evidence.

Several alienists testified in behalf of the defendant. Over the objection of the defendant, they were excluded from the courtroom while all the witnesses, except the defendant and his daughter, were testifying, and this action of the court is assigned as error. These alienists ought to have been permitted to remain in the courtroom during the whole of the trial and hear the evidence in order that they might form an intelligent opinion thereon. They were in the courtroom, however, while the two principal witnesses were on the stand, and therefore the defendant was not prejudiced by this action of the court to the extent that would warrant the reversal of the judgment.

As we find no reversible error in the record, the judgment of
the court below is affirmed.

*Affirmed.*


WHITFIELD, C. J., delivered the following dissenting opinion..
The appellant killed Mr. Laurent at Artesia, Miss., on the
15th day of January, 1909. The killing was merciless and
cruel in the extreme. Laurent was unarmed and anticipating
no difficulty. Smith had come to the depot in his hack to meet
his daughter, whom he expected from Columbus. Laurent was
standing near the depot building, on the grounds of which there
were some scores of persons; Smith did not see him. When
Smith, walking north, had passed him two or three steps, Laur-
ent, seeing Smith, stepped forward and extended his hand with
a view of shaking hands. Smith, turning, for the first time
saw him, became wildly infuriated, and struck him with his
umbrella which he was carrying under his arm. Laurent, as-
tonished, turned and ran through the crowd; Smith pursued
and struck him twice more with the umbrella. Laurent ran
behind a man, Smith pursuing, having drawn a pistol. This
man said to Smith, "Don't shoot me; I'm no shortstop," and
to Laurent, "Get from behind me." Laurent ran from behind
this man into the baggage room, attempted to shut the door,.
but could not do it. Smith pursued him, saying, "You need
not run," fired one shot at him as he entered the baggage room,
and Laurent fell against the wall on the floor. Laurent then
said to Smith, "Don't shoot he any more; don't kill me, don't
kill me." Smith, without another word, shot him twice in the
head whilst lying on the floor, killing him almost instantly.
Smith turned, walked out of the baggage room, put his pistol
into his bosom, and walked some steps down to the railroad
track. Some one asked him what he had done; he said, "Killed
a damned son of a bitch up there in the office." Mr. Mitchell,
a justice of the peace and lifetime friend, came to him and
asked him about what he had done, and he told him he had

shot this man, adding, "Bob, go and see him; if he ain't dead, I want to kill him." All this occurred within three or four minutes after the shooting. Mitchell went up, found he was dead, and came back and so reported to Smith. Smith then went to the telephone exchange and telephoned to his daughter that all was over and to keep quiet; also to his attorney at Columbus to come to Artesia at once, that there was a tragedy there, and to go by and see his daughter before coming, his daughter being, as stated, at Columbus. This, in brief, is the tragedy before us, so far as the circumstances surrounding the killing are concerned.

It is, of course, too plain for discussion that, if this had been the act of a sane man, Smith should have been convicted of murder and duly hanged. The defense, in the trial below, conceded Smith's manifest guilt of murder if sane, and the sole defense interposed was that the act of killing Laurent was the result of an uncontrollable impulse growing out of an insane delusion on the part of Smith to the effect that Laurent had debauched his daughter, such delusion rising to such a degree of force as that it overthrew the reason, judgment, and conscience of Smith in the act of killing; that, precisely, was the defense. It must be carefully observed that there was no sort of insistence on the part of the defense that Smith was not generally sane; that he was generally sane was conceded repeatedly throughout the trial by his counsel in the court below. The defense was not, therefore, general insanity, but that he killed Laurent under the particular delusion stated, as the result of an irresistible impulse growing out of that delusion, so strong and overmastering at the time and place of the killing as to completely overwhelm Smith's reason, judgment, and conscience. That, exactly, was the issue the jury had to try.

There is great danger in the trial of a case of this sort before the twelve average men in the jury box of allowing the horribleness, the cruelty, and the brutality of the killing to prevent that just and clear and dispassionate inquiry into the existence of the

special delusion by the jury which must be had if the defendant is to be tried according to the law of the land.

With this brief statement of the killing, let us now enlarge the view of the case so as to understand how the case was presented to the jury by the state and by the defense with respect to the existence of this insane delusion, and the degree to which it controlled Smith in his action. There were some things which I premise conceded in the court below: First, it was conceded by the state in the most emphatic and explicit terms over and over that Laurent never had debauched Smith's daughter. This concession is one of tremendous significance in this case. The jury were bound by this concession to dismiss from their minds any thought of Laurent having debauched her. It was their duty to take the innocence of Smith's daughter of this charge as an established fact. Second, the court itself charged the jury, first, that hereditary insanity in Smith's family was an established fact in the case and should be so treated by them, and, second, that the predisposition on the part of Smith to insanity growing out of this previously established hereditary insanity was also an established fact in the case, and the jury should accept it also as an established fact. These instructions are also of the greatest importance in this case, since they directly charge the jury that the effect of the testimony was to establish, beyond controversy, two facts, hereditary insanity and Smith's predisposition, on account of that hereditary insanity, to become insane himself. Third, the defense conceded over and over, in every form of statement, that Smith was generally sane, a good business man; that he had acquired a fortune; that he was shrewd, sagacious, and thoroughly competent to deal with men in all business matters in which he engaged; in short, to sum it all up in one word, that he was generally sane. This concession on the part of the defense is also extremely important as showing that no proof was needed on the part of the state to establish the mere fact of general sanity, if that proof had no other object than the establishment

·of the fact of general sanity; and, second, because it clearly
discloses both to the court and to the jury that Smith's defense
was limited strictly to the proposition that he had killed Laurent
when, and where, and as he did, because of an uncontrollable
impulse due alone to the insane delusion specified, existing in
such overwhelming force as to completely overthrow Smith's
reason and judgment, that is, his mind and conscience, that is to
say, his moral faculty, the faculty by which he distinguished
right from wrong.   The jury and the court were, therefore,
over and over again advised that this, and this only was the
narrow ground upon which his defense rested.

The court committed no error in charging the jury as above
stated.   The testimony shows, without contradiction, that Smith
had an epileptic father; two half-uncles insane, and who have
been in the insane asylum at Tuscaloosa, Ala., from sixteen to
eighteen years each to about sixty-one and sixty-three years of
age, being there now; one idiotic uncle; one full brother in the in-
sane asylum at Meridian; two female cousins deranged; one male
cousin in the asylum; and the daughter of a cousin also insane.
This testimony discloses that some of this insanity was upon
Smith's mother's side, most of it being in the family of Smith's
father.   Hereditary insanity having thus been established beyond
controversy, and the court having charged the jury that it was so
established and was to be accepted by them as true, and the
testimony having established Smith's predisposition to insanity
growing out of this hereditary insanity, and the court having
charged the jury that this predisposition had been established,
and was to be accepted as true, what were the instructions of
the court as to this delusion? Those charges were:

No. 5.   "The court charges the jury for the state: The de-
fense of so-called moral or emotional insanity or irresistible im-
pulse, where the defendant's mental power to distinguish be-
tween moral right and wrong with respect to the act for which
he is indicted remains unimpaired, it is not recognized by the
law of the state; and you are accordingly instructed that you

have no right to regard any such insanity as a legal excuse for crime. If the defendant commits a crime under an uncontrollable impulse resulting from mental disease, and which, at the time and place of the alleged crime, exists to such a high degree that for the time it overwhelms his reason, judgment, and conscience, and his power to properly perceive the difference between the moral right and wrong of the alleged criminal act, this would, of course, be a legal defense and excuse for such an act. But where the defendant, at the time of an alleged crime, is sane to the degree that he can properly perceive the difference between moral right and wrong with respect to the particular act, and knows that it is morally wrong for him to do the said act, then the mere fact that an alleged irresistible or emotional impulse constrained him to commit the act which he then properly perceived was morally wrong, will not, and cannot, amount to a defense for crime in this state, and you are so instructed. If, therefore, you find from the evidence beyond a reasonable doubt that at the time and place of the alleged killing of Eugene A. Laurent by the defendant, Charles R. Smith, that the said defendant, Smith, was not insane to the degree of disqualifying him from a proper perception of the difference between the moral right and wrong with respect to the alleged act of killing, but had the unimpaired use of his mind to the extent that he knew that the alleged killing of the said Laurent at that time and place was a moral wrong, then any alleged impulse of emotion prompting the defendant to do the act would not, of itself, amount to such mental insanity as would warrant the jury in acquitting the defendant upon any defense of alleged insanity; and, in such a case, any verdict of not guilty by reason of insanity returned by the jury would be improper and entirely unwarranted."

No. 2 for defense: "The court instructs the jury that it has been proven, in this case, by the undisputed testimony, that there is insanity in the family of the defendant, and that a predisposition or susceptibility to insanity on the part of the de-

fendant has been proven, and that in their consideration of this case the jury should regard these facts as established."

No. 20: "If from the evidence the jury believe that at the time of the killing the defendant honestly and in good faith believed that the deceased had seduced and ruined his only daughter, and that such belief on the part of the defendant had no foundation in truth and fact, and that on the occasion of the killing the defendant on meeting the deceased was seized with an insane and irresistible impulse to kill him because he believed that the deceased had seduced and ruined his only daughter, and that the defendant's act in killing the deceased was the direct result of said uncontrollable impulse, springing from a mental disease, existing in so high a degree that for the time being it overwhelmed the reason, judgment, and conscience of the defendant, then he is not guilty, and the jury will acquit."

This last instruction was modified by adding the words, "and that he was unable to distinguish right from wrong" after the word "defendant," in the last line, and, let it be noted, without making the ability to so distinguish relate to the very act of killing at the time and place.

What, now, is the testimony in this case with respect to the existence of this special delusion? On the part of the defense it shows that: The mother of the daughter died in childbirth; the daughter was the only child; the father kept her with him on the plantation until she was about five years old; at the end of that time, though all of his family were Protestants, he sent her to a Catholic convent in Jackson, where she stayed three or four years, returning home to the plantation in the summers; he then sent her to a Catholic convent in Mobile, where she stayed for several years; he then sent her to the I. I. & C. one year at Columbus; he then sent her to a Catholic convent in New York, and finally sent her to a Catholic convent in Paris, France, where she remained several years; he thus kept her in Catholic convents for a period of about fourteen years, acting apparently, upon the idea in Hamlet's mind when he said to

Ophelia, "Go, get thee to a nunnery; go;" during the time she was in Paris he wrote her constantly, and a large number of the letters are in evidence; there runs through all this correspondence a vein of most morbid extraordinary concern and anxiety with respect to his daughter's company and conduct, and with regard to the care she should constantly exercise in regard thereto, attesting a most unnatural, irrational state of mind on this subject at that time; after she came back home she spent several years on the farm; during all this time she never once received a gentleman visitor who called on her; she did, however, have girl friends who came to see her from time to time, and their visitors would, of course, meet her in the home and elsewhere; during this time a cousin, Miss King, came from Alabama to visit Smith and his daughter; on one occasion, whilst Smith 'and his daughter and Miss King were seated in a hack at Artesia, Laurent discovered them, and came up and was introduced to Miss Smith; this was the first time Miss Smith ever saw Laurent; on this occasion, in helping Miss King to the ground, according to the testimony of Smith, he put his arm around her waist and lifted her down to the ground; this action was deemed improper both by Smith and his daughter, Smith commenting on it as improper and wanting in respect to himself and daughter; later, at the request of Miss King, Laurent was invited to the Smith home; when he came Smith invited him into the house, but he declined to come into the house at that time, he and Miss King procuring a smoked glass and observing an eclipse of the sun, then on; later he and Miss King, after inviting Miss Smith and another young lady present to go to the woods or lawn in front of the house, went there alone, taking a lap robe with them, the others declining to go; later in the day dinner was served in the open air under some oaks, and at this dinner Laurent said to Miss King he had a mind to give her a "side swipe;" this language was deemed coarse and offensive by Smith; still later in the day, when the

party were sent back to Artesia, Laurent and Miss King took the rear seat, Miss Mercer, the housekeeper, and a Miss Robinson took the middle seat, and Miss Smith was thus left to take the seat in front with the negro driver; this was regarded by Smith as a snub to himself and daughter; at a later time, however, he did shake hands with Laurent at Artesia, though he said he did it "in a side way;" still later, Laurent, in company with Miss King and a Mr. Estes, in company with Miss Smith, spent a part of the evening, until about 11 o'clock at night, in one of the parks of the city of Columbus; subsequently, his daughter went to Mobile and Texas; upon her return from Mobile she had Dr. McKinley, who had prescribed for her several times, to prescribe again for nausea; Smith immediately was seized with the suspicion that this nausea meant pregnancy, and when his daughter wished treatment, which was declared to be necessary, at a sanatorium, he accompanied her to the sanatorium of Dr. McKinley in Columbus; on that occasion Smith told Dr. McKinley that his daughter had been debauched by Laurent, and told him to make a most careful examination, and after the operation was over, when McKinley assured him over and over that there was absolutely nothing in his suspicion, he required McKinley to give him a receipt showing exactly what the operation was for; McKinley testified most positively that he made a most thorough examination, and that there was absolutely nothing in the suspicion of the father, and that the girl was absolutely pure; but after this operation eccentricities are shown on Smith's part, such as talking to himself, gesticulating whilst riding and walking and when about the house, accompanied by insomnia and nervousness and the like; he was often seen sobbing by day and by night; as a result of all this his daughter became greatly distressed; and finally he charged his daughter, in a conversation between himself and her, with having been debauched by Laurent, which she indignantly denied, exhausting reason and argument in trying to con-

vince him that there was nothing in it; he wound up by saying that if Jesus Christ should appear and tell him she had not been debauched he would not believe it.

Two things are most noteworthy here: First, that the very acts, snubs, disrespect, etc., toward him and his daughter, which Smith's diseased mind tortured into evidence that his daughter had been debauched, show clearly to a rational mind Laurent cared nothing for her; and, second, the astounding fact that the father was the only person in all the world to suspect his daughter of impurity! It does the state infinite credit that throughout the trial it utterly scouted the charge that the daughter was not a pure woman.

This is a short summary, necessarily greatly condensed, and substantially presents the evidence which the defense insists shows conclusively the fact that Smith was laboring under an insane delusion that Laurent had debauched his daughter. Let it be specially noted: First, that the state introduced no alienists to contradict, in any wise the testimony of the five alienists introduced by the defense; second, that these five alienists all testified emphatically and most positively that the defendant was suffering under an insane delusion as to his daughter having been debauched by Laurent at the time he killed Laurent, and that that delusion was so strong as to destroy his mind and conscience, and that he was not an accountable being at the time of the killing. They further testify that a good memory can coexist in the mind with the kind of insane delusion under which the defendant labored, and that general sanity may also so coexist with this sort of delusion. There is not a word from any alienist to contradict this unbroken testimony; second, that the daughter Estelle; the farm manager, Mr. Walker; the storekeeper on the farm, Mr. Cockerham; the housekeeper, Miss Mercer—being the persons who were right about him every day and every night, and who knew him, of course, most intimately— every one swore most positively to the same effect, that his act in killing Laurent was the act of a man laboring under an in-

sane delusion and not responsible to the law; and that none of this testimony of any one of these witnesses is in any respect attempted even to be contradicted, impeached, or qualified. Then a host of other witnesses, brothers and relatives and acquaintances of the defendant, who had known him all their lives all testified to the very same effect, and not one of them is sought in any manner whatever to be impeached, nor is there any evidence of any description in the record contradicting any facts to which they testified upon which their opinions were based. If the combined testimony of five uncontradicted alienists and of those about him every day and night, also uncontradicted, and of the entire range of his relatives and acquaintances, also uncontradicted, and all emphatically to the effect that at the time of the killing he was laboring under an insane delusion and not responsible to the law, is not enough to warrant the jury, nay, require the jury, to acquit on the ground of insanity, then it may well be added that it would not be possible in any case anywhere to adduce testimony calling for an acquittal. And let it be kept in clear relief always that this man was entitled to an acquittal, not if the jury believed his plea of insane delusion, but if they had even a reasonable doubt of its existence—so small a quantum of evidence as would suffice merely to raise a reasonable doubt whether he killed because of this delusion imperatively required an acquittal under the law —and yet the jury said that this testimony just recited did not raise even such reasonable doubt, and this court affirms that finding. No man goes further than I do in rigidly and sternly upholding the criminal law and visiting its penalties upon those who violate it, if responsible and accountable beings, but I must say, and am forced by the testimony in this case to say, that there is not, in my judgment, any evidence whatever of any kind or description upon which this verdict can be upheld, according to the long-settled and well-established rules of law. I am firmly of the opinion that the court should have charged the jury on the testimony in this case to find the defendant not

guilty on the ground of insanity, and that the verdict should have ascertained him to be dangerous and he should have been sent to the insane asylum.   I have scanned this record from beginning to end, over and over and over, and it is impossible for me to acquiesce in the judgment of affirmance in this case, in the utter absence, as there is certainly in my view of it an utter absence, of any testimony whatever warranting the verdict.   It is urged as one of the assignments of error that the court should not have permitted the testimony which was admitted before the jury with respect to the five separate and distinct personal difficulties in which the defendant was engaged at different times within the past ten years with five other parties.   Since, as just stated, I think the verdict utterly unwarranted by the evidence, I shall not express any opinion as to the competency of this evidence.

There is no attempt, it may be said, on the part of the state to deny any of the facts testified to by the witnesses for the defense with respect to the existence of this delusion in Smith's mind; for example, Miss Smith herself testified that her father made this charge against her, and she herself told Mr. Walker, the manager of the plantation, and Miss Mercer, the housekeeper, and Mrs. General Sharp, her intimate friend at Columbus, about this charge.   Miss Mercer confirmed the fact that Miss Smith so told her, and that Smith himself so told her, and Dr. McKinley's testimony is positive and emphatic, as heretofore set out, that Smith was laboring under such delusion, and that it had no foundation whatever, but that Miss Smith was an absolutely pure woman.

This being the evidence on the question whether Smith was laboring under an insane delusion that Laurent had debauched his daughter, it becomes important to notice the instructions in the case set out *supra*.

Instruction No. 20 as heretofore set out in this opinion, was undoubtedly correct as asked, and it was fatal error for the court to modify that instruction by inserting the clause "that he was

unable to distinguish right from wrong." The test of general insanity, or rather, the test of the defense of general insanity, to wit, that the defendant must be able to distinguish right and wrong, had been propounded to the jury in various forms, but this is the only instruction for defendant in the case with reference to the killing being the result ·of uncontrollable impulse due to an insane delusion rising to such a degree as to overthrow the reason, judgment, and the conscience of Smith. This instruction presented that phase of insanity held to be a good defense in the masterly opinion of CHALMERS, J., in *Cunningham v. State,* 56 Miss. 280, 21 Am. Rep. 360. In the *Cunningham case* the ninth instruction was as follows: "Where the delusion of a party is such that he has a real and firm belief of the existence of a fact which is wholly imaginary, and under that insane belief he has done an act which would be justifiable if such fact existed, he is not responsible for such act. Nor is the party responsible for an act done under an uncontrollable impulse which is the result of mental disease." The first part of this instruction was pronounced by the court to be correct. The last sentence, "nor is the party responsible for an act done under an uncontrollable impulse which is the result of mental disease," was held defective only because it did not contain the idea that "the act was the direct result of an uncontrollable impulse springing from mental disease existing to so high a degree that for the time it overwhelms the reason, judgment, and ·conscience." Judge CHALMERS, speaking for the court, expressly held that, with this addition, the charge was proper and had been pronounced proper by SHAW, C. J., and this charge No. 20, as asked, was exactly the form approved in *Commonwealth v. Rogers,* 7 Metc. (Mass.) 500, 41 Am. Dec. 458, and *Cunningham v. State,* 56 Miss. 280, 21 Am. Rep. 360. CHALMERS, J., in speaking on this subject in *Cunningham v. State,* 56 Miss. 277, 278, 21 Am. Rep. 360, said: "The doctrine announced in the first clause of this instruction first found distinct utterance in the celebrated prosecution of Hadfield for the attempted as-

sassination of King George III (20 How. St. Tr. 1281), and owes its birth and adoption into the English law to the genius and eloquence of Erskine. It has been repeatedly since recognized, both in England and America, notably in this country in *Commonwealth v. Rogers,* 7 Metc. (Mass.) 500, 41 Am. Dec. 458, and in *Roberts v. State,* 3 Ga. 310. Of its correctness there can, we think, be no doubt. Indeed, though it has by some courts been denied recognition, it seems to us only another method of stating that there can be no crime where there is mental incapacity to distinguish between right and wrong; for, though delusions as to particular matters frequently exist in minds which are perfectly rational upon all other subjects, yet, if the delusion be so fixed and vivid as to make the imaginary seem the real, there must be upon that subject a total incapacity to distinguish between right and wrong, since, the entire relation between the victim of the delusion and its unconscious subject being mentally perverted, there can be no proper standard of right and wrong· in the diseased mind. That which to the rest of the world seems right is to him the most flagrant wrong, and *vice versa.* If to his deluded imagination his best friend, or the wife of his bosom, seems a relentless foe, bent upon his destruction, he necessarily acts upon the hallucination which possesses him; and, if his action is such as would be justifiable or proper if the reality was as he supposes it to be, there can be no accountability, because there has been no conscious crime. If a crazed enthusiast violates the law, impelled by a madness which makes him deem it the inspired act of God, he has only done that which his diseased and deluded imagination taught him was right; and if the act would be proper in one so divinely inspired, and was the direct and necessary consequence of the delusion, there can be no punishment, because, however rational on other subjects, he was on that subject incapable of having a criminal intent. The juries must, under the instructing guidance of the courts, be the judges of the sincerity and firmness of the belief, and of whether the act was in truth the direct and

necessary result of the insane delusion. There is but little danger that the sober common sense of mankind will be deceived by a feigned madness, or will fail to detect the craftiest imposter who, under the guise of insanity, violates the criminal law. The danger rather is that indignation at the crime, and incapacity to appreciate the delusion, which will make them incredulous of its existence." And never was that danger more signally exemplified than it has been in this present most distressing case. This case is one exceptionally peculiar in its circumstances, particularly in this, that this unfortunate defendant had the burden of a double aversion to contend with on the trial in the court below: First, the aversion the jury naturally had for him growing out of the brutality of the killing; and, second, the aversion which not only the jury which tried him, but the entire audience, had against him, naturally enough, too, growing out of his mad and crazed insistence that his daughter had been debauched. It would be difficult, indeed, to tell on which ground the jury and the audience, both, felt the most aversion for him; and it was this doubly unfortunate man to whom the court declined to give the very charge precisely fitting the exact defense which he set up. The court absolutely denied him the right to present his theory, the insane delusion, etc., and the uncontrollable impulse springing from it to the jury at all; for the modification of the twentieth instruction rendered it utterly meaningless and destroyed it entirely as a charge on the particular defense based on this special delusion that his daughter had been debauched, that delusion arising so high as to completely overthrow reason, judgment, and conscience.

I have said of the modification of the twentieth instruction that it rendered it utterly meaningless, and, in effect, destroyed its whole force as a charge peculiarly applicable to his precise defense, to wit, the special delusion under which he labored. My Brethren say that the addition of these words, "that he was unable to distinguish right from wrong," was correct. I think I have shown in what I have hereinbefore said that this mod-

ification confuses plainly two entirely distinct phases of insanity, and, further, that since the defense asked only this one charge on this, his special ground of defense, the denial of that charge was a refusal to permit the defendant to present to the jury by any charge the law appropriate to his theory of his ·case—a thing which all the books universally condemn. And this error was aggravated by the same mistake as to the law ·on the part of the learned judge below, in giving the fifth instruction for the state, which is plainly erroneous for the reasons I have indicated, and this fifth charge for the state is the only charge for the state which, in the remotest degree, relates to the precise defense set up by the defendant—the uncontrollable impulse destroying his conscience, his reason, and his judgment, growing out of the delusion on his part that his daughter had been debauched. We have, therefore, here the curious, extraordinary spectacle of the two only charges in the case which relate to the defendant's only defense, both thoroughly and radically wrong, and his defense therefore vitally affected, and prejudically to him and yet my Brethren say that all this does not constitute reversible error, or, indeed, even error at all.

My Brethren have quoted from quite a number of authorities, and cited a great many more, for the purpose of demonstrating that there is but one test of sanity, to wit, the capacity to distinguish between right and wrong, and also for the purpose of defining the kind of uncontrollable impulse which excuses from punishment on the ground that the defendant is not accountable. The trouble here is the confusing of two entirely distinct phases of insanity. In so far as these authorities are cited to define the uncontrollable impulse which constitutes a defense on the ground of insanity, I have only to say that, in my judgment; that sort of uncontrollable impulse acting under which one is excused is far better defined by CHALMERS, J., in the *Cunningham case, supra,* than in any other of the cases cited by my Brethren. It does not seem to me to be possible to define the two kinds of uncontrollable impulse, the one which so over-

masters and destroys the mind, judgment, and conscience as to render a person not accountable, and the one which does not so destroy the mind, but leaves its victim still able to distinguish between right and wrong, in language more perfectly clear than was done in the *Cunningham case, supra,* by CHALMERS, J. I certainly do not understand my Brethren as insisting on over-ruling the *Cunningham case.* They admit that uncontrollable impulse which blots out mind, judgment, and conscience does excuse one and make him not accountable to the law. Con-ceding that, as they are bound to do, since it was held to be a good defense in the *Cunningham case,* and by Chief Justice SHAW, I can see nothing to be gained in the presentation of their view by citing cases which disparage that defense. Mr. Justice CHALMERS in the *Cunningham case* itself stated that there were some courts which denied this defense, but that this court main-tained it as a sound defense, in company with the overwhelming current of authority both in the United States and England. So it must be taken as settled and put definitely and finally at rest in this state that, wherever the defense is that the defendant killed another as the result of an uncontrollable impulse so over-mastering in its force as utterly to destroy the mind, judgment, and conscience of the defendant, such defendant is no longer an accountable being, and the defense is perfectly valid.

It will thus be seen that the learned circuit judge inadvert-ently, by inserting the clause that he was unable to distinguish moral right from wrong, confused two wholly different phases of the defense of insanity. He applied the general test, the inability to distinguish between right and wrong, where the de-fense is general insanity, to a case, or at least to one branch of a case, where the defense of insane delusion rising to such a degree as to overthrow reason, conscience, and judgment was the defense put forward. It must be obvious, on careful reflection, that if an insane delusion rises to that degree of force that it completely overthrows reason and judgment (that is to say, the mind) and also the conscience (that is to say, the moral faculty

which distinguishes between right and wrong), thus completely overthrowing both the mind and the conscience, there can be, necessarily, no ability to distinguish between right and wrong left in such a man. He certainly cannot be able to distinguish between right and wrong all of whose reason and judgment and conscience are gone. There is no other instruction in this case presenting this defense, and the error confuses two wholly different defenses, and is necessarily fatal to conviction in this case. In the *Bovard case,* 30 Miss. 600, the effect of uncontrollable impulse was not involved and was not discussed. The court said in that case: "There was no proof before the jury, either directly or by inference, showing that the fancy or delusion under which he labored had any connection as the antecedent or cause with the commission of the offense." All that was said in the *Bovard case* as to the capacity to distinguish between right and wrong was said without any reference to the effect of uncontrollable impulse due to disease of a mind in which reason, conscience, and judgment had been entirely overthrown. It will also be seen by reference to the fifth charge of the state that the learned judge again confused in that charge the law as to the general test of knowing right from wrong, where general insanity is pleaded, with the question where special delusion is set up, whether that delusion exists in so high degree at the time of the act as to completely destroy reason, judgment, and conscience. It is undoubtedly true, as attempted to be stated in said fifth charge for the state, that we do not recognize in this state the doctrine of emotional or moral insanity. That doctrine was, most happily, thoroughly repudiated by CHALMERS, J., for the court, in *Cunningham v. State,* *supra,* 56 Miss. 278, 279, 21 Am. Rep. 360. Speaking of that, he said: "Its peculiarity is said to be that, while the mental perception is unimpaired, the mind is powerless to control the will; that while its unhappy subject knows the right and desires to pursue it, some mysterious, uncontrollable impulse compels him to commit the wrong. The possibility of the existence

of such mental condition is too doubtful; the theory is too problematical, and too incapable of a practical solution to afford a safe basis of legal adjudication. It may serve as a metaphysical or psychological problem to interest and amuse the speculative philosopher, but it must be discarded by the juries and lawgiver in the practical affairs of life." I most heartily approve this repudiation of the doctrine of moral or emotional insanity. But the court in the *Cunningham case,* whilst repudiating this doctrine, expressly recognized and approved the doctrine that, wherever one is laboring under an insane delusion on a particular subject, and that insane delusion rises to so high a degree as to completely destroy the reason, the judgment, and the conscience, there can be then for such person no criminal responsibility. And in such case, the test of capacity to distinguish between right and wrong, the act of the conscience, or, to put it otherwise, the mental ability to perceive, as an exercise of reason, the difference between right and wrong, an act of the intellect, should never be applied in an instruction, since that test cannot be proper where there is no conscience and no reason and no judgment to be exercised. The manifest incongruity, the plain impropriety of applying the test of ability to distinguish between right and wrong as an act of reason, or an act of conscience, to one who has neither reason nor conscience, since both have been destroyed by the overwhelming delusion, must be too clear for further argument.

There was, therefore, fatal error in modifying the twentieth instruction asked by defendant, which instruction was not used by the defendant after modification, and in confusing in the fifth instruction for the state emotional insanity with insane delusion. In emotional insanity the mind still acts and perceives the difference between right and wrong, but there is a lesion of the will, as a result of which the party, while perceiving clearly the difference between right and wrong, is unable to resist or refrain from the criminal act. In the insanity set up here, to wit, uncontrollable impulse due to an insane delusion

of such tremendous force as utterly to destroy reason, conscience, and judgment, there is no mind, there is no judgment, there is no conscience left by which the difference between right and wrong can be perceived.

Finally, it is urged that this verdict was due, manifestly, to the conduct of the audience during the trial of his cause, and this ground of the motion for a new trial is pressed upon us with great earnestness, and was so pressed upon the learned court below. A great many witnesses were introduced upon this point, and it may be stated, in short, that it was clearly shown that the audience constantly engaged in applause, lighter or more pronounced, at every stage where the state scored a point; it is even shown that there was slapping of the hands and stamping of the feet, most emphatic expressions of approval of the prosecution. Dr. Sharp testified that he thought nine out of ten persons in the audience were for the prosecution with Bantle Bell; that it was perfectly apparent that the sympathy of the entire audience was in favor of the prosecution, and that there was nothing to prevent the jury from seeing that. So highly wrought had the audience become, and so constant and emphatic were their interruptions by the applause of the prosecution, that the jury was retired, and the counsel for the defense and counsel for the state joined in asking the court to put a stop to this unseemly conduct, and the learned circuit judge actually had the sheriff appoint some dozen special deputies for the express and declared purpose of suppressing these highly improper manifestations on the part of the audience. I would not be understood as criticising in the least degree the learned circuit judge. He threatened the audience; he reprimanded the audience severely; he had special deputies enough appointed it would seem, to suppress any applause from any audience, and what more he reasonably could have done it is difficult to say; but one thing is certain, that is, that he did not suppress the applause, and the sheriff did not suppress it, nor did the twelve deputies with the sheriff. One thing remains clear, and that

is, that the audience, in spite of the court, the sheriff, and his deputies, persisted in this most reprehensible course, and this very fact is the highest possible evidence that the atmosphere of the courtroom reached the jury, that the temper of the audience reached the jury, and that the feeling and spirit of the audience became, necessarily, the spirit and feeling of the jury; and it is in this way alone, in connection with the manifest errors in the instructions which have been pointed out, that the verdict of the jury can possibly be accounted for. The jury absolutely ignored all the evidence in respect to insanity. They did not weigh the evidence. It is impossible that they could have weighed the testimony with reference to the existence of this delusion and the effect of its operation upon the defendant's mind; had they done so, an acquittal was certain, but with the audience cheering the prosecution on constantly and repeatedly in the face of the rebuke of the court, with the very atmosphere impregnated with the double aversion of which I have spoken because of the brutality of the killing, and because of his barbarous, crazed, insane delusion, under the operation of which he was imputing a lack of virtue to his only daughter, the jury were swept from their moorings, and this verdict is not the result of the law and the evidence, but of the misdirection of the court in the particulars indicated, but most especially the result of the inflamed condition of mind into which the jury were excited by the unwarranted conduct of the audience. Surely, it needs not to be said that public clamor against the defendant must stop at the door of the temple of Justice. Within its sacred precincts nothing should enter to affect the jury save the law as given by the judge and the testimony as delivered by the witnesses. All within is holy ground, and should never be permitted to be profaned by unwarranted demonstrations on the part of the audience, such as marred the trial of this man in this case. It was a trial by the audience, not a trial by the court and jury. It was a crucifixion of Justice in her own temple. This court has heretofore spoken in no un-

certain tones upon this proposition.　In the case of *Cartwright v. State,* 71 Miss. 86, 14 South. 527, the court there said: "This method of communicating to and impressing upon the jury, or any member of it the opinions of others, is open to the same condemnation which would be visited upon oral expressions of opinion touching the defendant, injected into the body of the jury by some designing intermeddler.　We can see no difference, unless in degree.　The widely read and influential daily journal, speaking for as well as to the public, reflecting popular sentiment as well as making it, must be held to be much more powerful in influencing the average man than any expression of opinion by a single private individual.　We know of no reported case in which an outside person has been shown to have talked with the jury, or a member of it, concerning the accused when on trial for high crime, and especially to have talked unfavorably to and with the jury of the accused, in which the verdict has not been set aside.　It seems to us impossible to distinguish between the mischief done by oral and written or printed communications.　In every instance in which improper influences have been brought to bear upon the jury, there will arise the fear that the accused has not had that fair and impartial trial to which he was entitled."　And in *Raines v. State,* 81 Miss. 495, 33 South. 19, where the only applause was simply a burst of applause at the conclusion of the argument of the prosecution, not repeated applause and constantly cheering the prosecution on, as in this case, the court said: "That the misconduct of the audience or of others, strangers to the proceeding, when done to affect the result of the case, may infect it with fatal error, is established by many cases in the books, not necessary to here note.　The applause given by the audience at the close of the oration of the prosecuting counsel was intended, doubtless, to influence the verdict of the jury, and was a gross breach of the proprieties of the occasion and an undisguised affront to the authority of the court.　In *Cartwright v. State,* 16 Tex. App. 473, 49 Am. Rep. 826, in a matter of applause

by the audience, in like circumstances, which was not in any way noticed by the trial court, Judge Wilson said: 'We think the court should have taken prompt and decisive action on the occasion, and should have endeavored, by its condemnation of the proceeding and its admonition to the jury, to prevent any prejudice to the defendant by such reprehensible conduct.' The court in the present case promptly checked the demonstration and reprimanded the audience, yet the want of any admonition to the jury not to suffer itself to be misled by the applause of the audience renders the point made here of the gravest difficulty.   In view, however, of the fact that the judgment rendered in this case must be set aside for other grounds of error, we have thought it unnecessary to determine whether this unseemly incident is a fatal infirmity in this case."

I am thoroughly satisfied, and cannot escape the conviction, that the only way in which to explain this verdict is to attribute it in part to the erroneous instructions indicated, but most especially and emphatically to the extraordinary applause constantly repeated and uniformly kept up throughout the progress of the trial whenever the state scored a point.   It is idle to say that the twelve plain men in the jury box were not impressed by this demonstration; that the spirit of the audience did not come to infect the jury box itself; that the very atmosphere of condemnation was breathed from the audience into the jurors, and that they left the box with the set conviction that a verdict of guilty was demanded by the audience and must be rendered. It is extremely easy to explain the aversion of the audience. Nothing could be more natural than their feeling, looking at the case from their standpoint.   They realized the awful brutality of the killing; and lost sight of the question of sanity because horrified at the cruelty of the killing; and again, and very likely worse for the defendant, they were shocked and astounded at the unaccountable perversity of the defendant in believing, in the face of the protest of all the world, and declaring in the face of all the world, and swearing to the jury on this trial

against the settled declaration of every one in any way connected with the trial, that his daughter was guilty of having been debauched, and that he would not believe the contrary even if Jesus Christ should appear and tell him to the contrary. What more natural than that the average audience should be caught *ad captandum* with the overwhelming force of two such terrible aversions, and work itself into a frenzy against the defendant; and yet, whilst nothing is more natural from the standpoint of the audience, when we come to remember that this man stood on trial for his life before a jury of his countrymen in the temple of Justice, surrounded by the guaranties of the Constitution and the laws of the land, nothing could be more reprehensible than the conduct of that audience, necessarily resulting in transferring to the bosoms of the jury the feelings which inflamed their own hearts and minds.

From the reasons indicated, I dissent emphatically from the reasoning of the court and the judgment in this case.