[Crim. No. 758.　In Bank.—February 14, 1902.]

## THE PEOPLE, Respondent, v. FRANK R. DONLAN, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—MOTIVE OF REVENGE—SANITY OF DEFENDANT.—Upon the trial of a defendant charged with murder, who relied upon the defense of insanity, evidence tending to show a motive of hatred and revenge, and that the acts of the defendant were not those of an insane person, is admissible for the prosecution.

ID.—INSTRUCTION AS TO DEFENSE OF INSANITY—CAUTION TO JURY.—In instructing the jury as to the defense of insanity, it was proper to caution them in substantial accordance with the previous decisions of this court, and to tell them, in substance, that while they should weigh the defense fully and justly, and should sustain it as humane and just when satisfactorily established, "they are to examine it with care, lest an ingenious counterfeit of such mental disorder should furnish protection to guilt."

ID.—INSTRUCTION AS TO TIME OF INSANITY—PRESUMPTION—BURDEN OF PROOF—RANGE OF EVIDENCE.—It was proper to instruct the jury that they were not required to determine whether or not the defendant was insane at the time of trial, but that the issue was as to whether he was insane at the very time of the homicide; that the law presumes him sane, and that the burden of proving his insanity rested upon him; and that in determining the question whether he was insane at the time of the alleged commission of the act, they were to consider all of his acts and conduct as shown by the evidence at that time, and before and since that time, and to consider his appearance and actions during the trial, as a circumstance in determining his insanity at the time of the homicide.

APPEAL from a judgment of the Superior Court of Tulare County and from an order denying a new trial.　W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

Maurice E. Power, for Appellant.

Tirey L. Ford, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

VAN DYKE, J.—Defendant was informed against by the district attorney of the county of Tulare for the crime of murder. He was tried and convicted of murder in the first degree. A motion for a new trial was made on the part of the defendant and denied by the court, and defendant was sentenced to be hanged. From the judgment and order overruling said motion defendant prosecutes this appeal.

1. On behalf of appellant, errors are assigned in the admission of certain testimony by the trial court.

It appears from the evidence that the defendant, about the first of the year 1891, induced the deceased to leave her home in San Francisco and take up her abode with him in a house of prostitution in said city. In about four weeks, the mother of the deceased, having learned where her daughter was living, visited the place and demanded of the defendant that he marry the deceased. The defendant consented to this, and procured a marriage license, and subsequently the daughter told her mother that she had been married to the defendant. This statement, however, it appears was not true. During the time between the date when the deceased first went to live with the defendant and the day of the homicide, they lived together in houses of prostitution in various parts of the state, but the deceased at several different times returned and lived with her mother for considerable periods, at which times it appears that she lived respectably. Finally, in June, 1900, the defendant, the deceased, her mother and stepfather, and her half-brother, moved to the Kuhn ranch, in Tulare County, where they were all employed picking fruit, and where the defendant killed the deceased on the 18th of June, by shooting her. For several days prior to the homicide defendant had endeavored to induce the deceased to leave her family and go away with him again, which she had refused to do. The defense was based upon the alleged insanity of the defendant at the time of the homicide.

During the examination of Mrs. Obregon, the mother of

the deceased, and after stating in her testimony that Donlan had told her he was going to Sacramento, she was asked: "Q. What did he tell you about that?" And the witness answered, after the objection thereto had been overruled: "Why, he told me that he went to Sacramento, and went to Oroville, and that they were chased out of Oroville.—Q. Did he tell you why?" The objection to which question being also overruled, the witness answered: "Because they would n't allow no man up there with a woman. Then he said they did n't allow no man up there that was living with a woman that was taking care of a man, and that the people of Oroville would n't allow it where a woman was taking care of a man." Frank C. Shepherd, son of the preceding witness, and brother of the deceased, was asked to describe the kind of house in which the deceased and the defendant were living, and answered, after the objection to the question had been overruled: "Well, it was a house of prostitution." He was told to state the conversation he overheard between the deceased and the defendant, and after objection thereto had been overruled answered: "Well, after supper Mr. Donlan gave me ten cents and told me to go to the theater that night, and if the show was out before half-past eleven, to stay out—to stay out until after that time, then I could come home." Also, with reference to a certain conversation between defendant and deceased at the same time and in the same house, and after objection being overruled to a question to give the conversation, he stated: "She says to him—first he was mumbling to her about something I could n't understand. Then I heard her say: 'Well, I have done as much as I could to-day; the cops are after us girls.'" And again he was asked what time of the day she would get up, objection to which question being overruled, he said: "At one or half-past one in the afternoon." He likewise said: "Well, I have known her to be a prostitute.—Q. And Mr. Donlan was living with her at that time, was he not?—A. At different times—yes; not all the time he was n't."

It is claimed on the part of appellant that this testimony was irrelevant and had a tendency to prejudice the minds of the jury. If the evidence tended to establish the facts constituting the offense charged in the information—that is, that the acts of the defendant were the acts of a debased

and murderously inclined person, instead of those of a mad-man or one insane—it was right and the duty of the people's attorney to offer such evidence, and the court did not err in admitting it. The purpose was not to prejudice the minds of the jury, but rather to convince them of the truth of the acts charged. The evidence tended to show a motive for the homi-cide, and that the acts of defendant were inspired by hatred and revenge, and were not those of an insane person. The evidence, therefore, was relevant, and tended to show that defendant was sane at the time of the commission of the offense charged. As said in *People* v. *Lee Fook,* 85 Cal. 301, "It was proper for the court to allow such testimony to go to the jury on the trial, with a view to enable them to determine whether the defendant was insane at the time of the com-mission of the offense."

2. Certain instructions were given to the jury by the court which are assigned as error. The portion of one of the instructions to which objection is taken reads as follows: "The defense of insanity is one which may be, and sometimes is, resorted to in cases where the proof of the overt act is so full and complete that any other means of avoiding convic-tion and escaping punishment seems hopeless. While, there-fore, this is a defense to be weighed fully and justly, and, when satisfactorily established, must recommend itself to the favorable consideration of the humanity and justice of the jury, they are to examine it with care, lest an ingenious counterfeit of such mental disorder should furnish protection to guilt." This court has sustained instructions substantially the same as the foregoing. In *People* v. *Larrabee,* 115 Cal. 159, the instruction complained of read as follows: "The defense of insanity is one which may be, and sometimes is, resorted to in cases in which the proof of the overt act is so full and complete that any other means of avoiding convic-tion and escaping punishment seems hopeless. While, there-fore, this is a defense to be weighed fully, fairly and justly, and, when satisfactorily established, must commend itself to the sense of humanity and justice of the jury, they must examine it with care, lest a mere counterfeit of this mental infirmity shall furnish immunity to guilt."

In that case it is said by the court: "This is in all essen-tials identical with the instruction approved in *People* v.

*Pico,* 62 Cal. 50. In *People* v. *Dennis,* 39 Cal. 625, and in
*People* v. *Bumberger,* 45 Cal. 650, it was held to be proper for
the trial court to instruct the jury to view the evidence upon
the defense of insanity with care, lest feigned insanity might
shield a defendant from the just consequences of his guilt.''

Exception is taken also to another instruction, the portion
complained of being as follows: ''You are not required to
decide whether or not the defendant is insane at the present
time, but you are to consider him as now sane. A person
charged with crime cannot be legally tried for such crime,
unless he be sane at the time of the trial. The defendant
has presented the issue to you that, at the very time of the
alleged commission of the homicide, he was insane. The law
presumes that he was sane, and therefore the burden of prov-
ing his insanity at the time rests upon him. In determining
the question whether the defendant was insane at the time of
the alleged commission of the act, the jury are to consider all
his acts at the time of, before, and since the alleged commis-
sion of the act, as such acts and conduct have been shown by
the evidence, and the jury have the right to consider the
defendant's appearance and actions during the trial as a cir-
cumstance in determining his insanity at the time of the homi-
cide.''

In *People* v. *Schmitt,* 106 Cal. 50, the instruction com-
plained of read as follows: ''You are not to consider whether
or not the defendant is insane at the present time, but you are
to consider him as now sane. A person charged with crime
cannot be legally tried for such crime unless he be legally
sane at the time of the trial. The defendant has presented
the issue to you that at the very time of the alleged com-
mission of the homicide he was insane. As I have already
told you, the burden of proving his insanity at that time rests
upon him, because the law presumes he was then sane.'' It
was suggested in that case that such an instruction invaded
the province of the jury, and was equivalent to stating as a
fact that the defendant was then sane. The court in reply
stated that no question was made during the trial that he
was then insane. The same may be said in reference to the
case at bar. The defendant went to trial as a sane man, and
conducted his defense as such, and, as stated in the opinion
referred to, no person being insane at the time can be legally

tried. It may not be amiss to repeat here what was said in *People* v. *Larrabee*, 115 Cal. 159: "We have not observed that the defense of insanity has been employed since the decision of these cases in a manner to make the caution less needful."

Judgment and order affirmed.

Garoutte, J., Henshaw, J., and McFarland, J., concurred.

Rehearing denied.