[Crim. No. 2386. In Bank.—March 7, 1922.]

THE PEOPLE, etc., Respondent, v. JOHN VALCALDA,
Appellant.

[1] CRIMINAL LAW—MURDER—INSANITY—EVIDENCE—REBUTTAL.—In a
prosecution for murder, where the sole defense was insanity, and
the defendant offered proof of specific acts and conduct to show
that he was a gentle, generous-natured, inoffensive man, it was
proper to admit evidence, offered by the prosecution to meet this
evidence, showing other specific acts and conduct on the part of
the defendant to the effect that he was a litigious, quarrelsome
man, holding enmities, resulting in real or imaginary wrongs, and
threatening violence to those who had incurred his enmity, the
latter evidence covering the same period as that offered by the
defendant.

[2] ID.—MISCONDUCT—WAIVER.—In a prosecution for murder it is too
late on appeal to urge misconduct on the part of the district at-
torney in argument, where no objection to his remarks was urged
at the trial and no request made for instruction thereon.

APPEAL from a judgment of the Superior Court of Amador County. C. P. Vicini, Judge. Affirmed.

The facts are stated in the opinion of the court.

McNoble & Berry for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and T. G. Negrich, District Attorney, for Respondent.

RICHARDS, J., *pro tem.*—This appeal is from a judgment of conviction of the defendant of the crime of murder of the first degree. The homicide with which the defendant was charged was that of having shot and killed one John Cox in the city of Sutter Creek, Amador County, on the second day of March, 1921. The shooting occurred at about the hour of 3:30 o'clock in the afternoon of said day, upon the main street and in the business part of said city, and as to these facts and also as to the fact that the defendant shot and killed the deceased without warning or immediate provocation there was no dispute.

The sole defense which was offered on behalf of the defendant upon his trial was the defense of insanity, and upon that issue a large amount of evidence was presented both for and against said plea. The jury found against the defendant upon this issue and upon his plea of not guilty, and found him to be guilty of murder in the first degree. The court sustained this verdict upon motion for a new trial, and sentenced the defendant to suffer the death penalty for his crime.

Upon this appeal the appellant urges that the evidence in the case was insufficient to justify this verdict and judgment, but the burden of his contention in that regard is placed solely upon the plea of his insanity for a long time prior to and at the time of the commission of the homicide. It would serve no useful purpose to state this evidence in detail to a greater extent than it may be found necessary so to do in determining the other points made upon this appeal, since we are satisfied from a careful review of this evidence that it was amply sufficient to justify the verdict of the jury.

The next and main contention of the appellant is that certain testimony of a highly prejudicial character, offered on behalf of the prosecution in rebuttal of the defendant's said plea and proofs of insanity, was permitted to be introduced by the court over the defendant's objection. This testimony is summarized in the appellant's brief as follows: "On rebuttal, the people were permitted to introduce evidence that, 1. In the month of December, 1917, defendant was arrested upon a charge of misdemeanor, found guilty, paid a fine of $510, and served eight days in jail. 2. That in the month of December, 1920, or January, 1921, he interfered with an officer in the discharge of his duty. 3. That in the month of January, 1921, defendant 'threatened to cut the heart out of one John Brignoli and make him eat it,' and in the same month he 'threatened to cut the guts out of an Austrian' who owed him some money." This objectionable testimony was but a small portion of a much larger mass of evidence presented by the prosecution in rebuttal of the defendant's said plea, and both the reason and justification of its admission is to be found in the following state of the record before us. In the early stages of the trial and at the outset of the defendant's proffer of evidence in support of his plea of insanity, the defendant's counsel in his opening statement to the jury said: "We will show you, gentlemen of the jury, that the disposition of this defendant is that of a kind and generous one, a man who was always ready to help and assist anyone who was in trouble, a man who loved children and was constantly making children of his acquaintance presents." A little later, and in support of the defendant's offer of evidence as to a specific act of kindliness and charity on the defendant's part, his counsel said: "Now, all of this matter, all of his acts and conduct and what he said will go to make up this proposition." The proposition to which defendant's counsel was addressing himself, and with reference to which a considerable amount of evidence of like character to that above offered was given, was that of showing the defendant before the jury in the favorable light of being a kindly-hearted, generous-natured man, such an one as would not have committed the murderous and cowardly crime with which he was charged while in a sane and normal state of mind. A further reason for the defend-

ant's proffer of this sort of evidence consisted in his claim, accentuated throughout the trial and insisted upon here, that there had never been any quarrel or cause of hatred as between himself and the deceased during their years of acquaintanceship and residence in the same town. With regard to these claims, a brief review of certain facts, bearing directly upon the relation between the parties as well as upon the defendant's mental attitude and poise for some time prior to and at the moment of the homicide, will be necessary.

The defendant was a native of Italy, having been born, there in about 1888, and having come to the United States in about the year 1903. A few years later, becoming ill, he was sent home to Italy, the expense of his return there being met by a collection taken up by his friends. Some two or more years thereafter he came back to California, restored in health, and by working in the mines repaid his friends their expenditure on his behalf, and somewhat later came to Sutter Creek, where he opened a saloon and gambling place in the conduct of which he was apparently fairly successful. The deceased, John Cox, was also a saloon-keeper in Sutter Creek at this time, and the relations between the two were friendly. In the latter part of the year 1914, John Cox informed the defendant that a woman named Elizabeth Peirano, who was a friend of his, was in destitute circumstances, her husband having just died, leaving her with five dependent children. The defendant, who was at the time a stranger to the woman, co-operated with Cox in soliciting funds for her relief, collecting about $139, a portion of which he contributed and which was in part applied to the payment of the funeral expenses of the deceased husband and the balance delivered by the defendant to the widow. The defendant was at this time and thereafter an unmarried man. Some months after this act of benevolence this woman began visiting him, coming to the rear part of his saloon, which being brought to the attention of a Mrs. Bogliolo, a cousin of the defendant, she undertook to warn the defendant against the woman upon the ground that she was no good. The defendant seems to have been put upon inquiry by this warning, since a little later he informed his cousin that the woman was also in the habit of going to the back door of

Cox's saloon, and that Cox, who was a married man, was urging the defendant to marry the woman, which he had promptly refused to do, although his illicit relations with her continued. This was in the year 1915. In April, 1916, Mrs. Peirano gave birth to a child in San Francisco, and in the birth certificate named the defendant as the father of the child. Upon learning this fact the defendant was much exercised and consulted an attorney with a view to demanding that his name be taken from said birth certificate. This being found impossible, the defendant sought the Peirano woman and resumed relations with her and told her that he would marry her if she would produce the child and enable him to convince himself by its inspection that he was its father. This she failed or refused to do and the defendant began asserting that not himself but John Cox was the father of the child. The idea that his name appeared in this birth certificate as the father of this child when, as he claimed, John Cox was its real father, became apparently an obsession with the defendant, for he consulted various attorneys and made various attempts in the vain effort to have this record changed, and also talked frequently upon the subject with his friends and acquaintances, often in a much excited and disturbed frame of mind, during the several years which followed. In the meantime, John Cox removed from Sutter Creek to Vallejo, where he took employment as a blacksmith. The defendant also, in the year 1918, left Sutter Creek, going to San Francisco to live. John Cox and the defendant did not come in contact during these latter years while the former was living in Vallejo and the latter in San Francisco. It does not appear what became of the Peirano woman in the meantime, but the defendant frequently in talking with his friends dwelt upon his standing grievance that his name appeared in the said birth certificate as the father of said Peirano woman's child, while in fact said John Cox was its father.

Upon the trial of this cause, the appellant urged that these numerous instances of the defendant's mental distress over this matter developed from an obsession into a derangement of mind until he became a paranoiac, and that such was the form of his insanity when he saw John Cox for the first time in several years on the afternoon of the

2d of March, 1921, on the streets of Sutter Creek, and there slew him without present provocation or any warning. Intermingled with this proof and contention, counsel for the defendant presented at the trial the specific evidence above referred to as to the defendant's kindliness of nature, generosity, and affection for children, and the jury was asked to believe, upon the strength of this evidence, that the defendant had no quarrel with John Cox and held throughout no evil disposition toward him, and hence that the act of killing him without provocation or apparent cause was in itself the strongest proof that the defendant's act in so doing was the act of an insane person. It would seem to require no very deep or searching analysis of sex psychology to show that ordinarily, as between the two male members of such a triangle of illicit love and passion, feelings of jealousy and hatred would be borne in the breast of one or the other of them, and most probably in the bosom of that one who came to feel that the other had secured from the object of their common desire a higher pledge of affection than he himself had been able to secure. As an offset to this reasonable deduction, the defendant offered the specific evidence as to the defendant's mild and generous and gentle character. The importance of this evidence to the defendant's case cannot be overestimated, and it was to meet such proof in the specific form in which the defense had chosen to present it and to overcome its effect that the prosecution offered and secured the introduction of the evidence at which the main objection of the appellant has been aimed. That evidence consisted in the showing that at some time during the year 1917 the defendant had become involved in a litigation in the course of which he had been subjected to a fine of $500, or thereabouts, with the alternative of a jail sentence, and that after serving eight days in jail he had paid to the sheriff the amount of this fine, and that later on he had gone to the sheriff's office in an attempt to have the Peirano woman arrested upon some charge involving the insertion of his name in the aforesaid birth certificate, and that upon the refusal of the sheriff to make such arrest without a warrant the defendant, in an excited frame of mind, had charged the sheriff with having robbed him out of the $500 which he had paid as such fine. The prosecution also, over the de-

fendant's objection, offered evidence to show that there had been trouble between the defendant and one John Brignoli over a debt which the defendant had owed the latter and for which he had given as security some stock in a mining corporation which Brignoli had sold for the debt; and that litigation arising from the affair, Brignoli paid the defendant $500 to settle the case. Not long thereafter, a mutual friend, one Malatesta, saw the defendant in an effort to restore friendship between the latter and Brignoli, with the result of the defendant saying, "I don't want you to talk John Brignoli to me. Furthermore, if he comes around me I will cut his heart out and make him eat · it." The witness Malatesta also testified that upon another occasion the defendant, speaking of a certain Austrian who owed him forty dollars and whom he said he was going to see, said: "I'll either get that forty dollars or I'll cut his guts out." The prosecution also, over the defendant's objection, introduced evidence to the effect that . upon an occasion but a few months prior to this homicide, the defendant had interfered with one Joe Bernardis, a local constable, in the discharge of his duty, by objecting in an angry manner to the latter's arrest of another person.

As to all of this evidence the court stated to the jury at the time it was offered that it was not admitted for the purpose of showing other offenses or any intention of committing other crimes, "but for the sole purpose of showing , whether or not he was sane or insane, the condition of his mind, and for that purpose alone the testimony is admissible; and the jury will be instructed that all such testimony goes in only on the fact—to establish one fact, and that is the sanity or condition of mind of the defendant."
[1] With regard to the admissibility of the foregoing evidence, especially for the purpose for which it was offered and to which it was thus limited, we entertain no doubt. The defendant himself opened the door for the admission of such evidence by himself offering proof of specific acts and conduct showing the defendant in the favorable light of being a gentle, generous-natured, inoffensive man. The prosecution met this evidence with a showing of other specific acts and conduct on the part of the defendant showing him to be a litigious, quarrelsome man, holding enmities, resulting in real or imaginary wrongs, and threatening vio-

lence to those who had incurred his enmity. This evidence as to the acts and conduct of the defendant during the same period covered by the evidence presented on the defendant's behalf upon the issue of insanity bore directly upon the question as to the mental attitude of the defendant toward the deceased for a considerable period preceding the homicide, and upon the vital question in the case, viz., as to whether the defendant in slaying the deceased was acting as a sane but evil-minded man destroying his enemy, or whether he was a mentally unbalanced paranoiac, doing his deadly deed without motive or criminal intent and without realizing the wrongfulness of his action.

The authorities fully sustain the action of the trial court in the admission of this evidence. The leading case upon this subject throughout the whole country is that of *United States* v. *Guiteau,* 1 Mackey (12 D. C.), 498, in which the murderer of President Garfield was upon trial and in which the defense was insanity. The supreme court of the District of Columbia, in commenting upon the evidence *pro* and *con* which had been presented upon that plea, said: "Several witnesses were allowed to testify to acts of the defendant in 1872, and in two or three years following, which were fraudulent. Evidence had been introduced on his part, for the purpose of proving insanity, which searched the history of his whole life, down to the time of the act charged in the indictment. The defendant himself had, as a witness in his own behalf, gone over the same ground. In this body of defensive evidence his moral nature and traits had been presented, as a means of showing that acts done by him must be accounted for by a conclusion of insanity. It was competent to show, in rebuttal, that the grounds on which this inference of insanity was based, did not exist, and to do this by exhibiting particular acts and conduct of the defendant, contemporaneous with the history produced on his part, which tended to disprove the existence of those grounds. If a conclusion might be drawn from his moral nature that his acts must be insane, it was relevant and proper to show that his *real* moral nature was one which did not call for such an explanation. After comparing the evidence, as to particular acts, offered on both sides, we are of the opinion that the

evidence in rebuttal was responsive to the evidence in defense, and was admissible."

The circuit court of the United States has announced the same doctrine in the case of *United States* v. *Holmes,* 1 Cliff. (U. S.) 98 [Fed. Cas. No. 15,382], wherein the court, in the course of a long and illuminating opinion says: "When a person accused of crime relies upon his prior and subsequent acts, conduct, and declarations to show that he was insane at the time he committed the act charged against him, and actually offers them in evidence to establish that defense, we entertain no doubt that it is competent for the government to introduce other acts, conduct, and declarations of the accused within the same period, to rebut that presumption, and to show that he was sane. Were it otherwise, it is not perceived how this class of legal investigations can be satisfactorily conducted, as jurors, if the proposition assumed by the counsel for the prisoner be correct, must always be compelled in cases like the present to decide the question of sanity or insanity upon a partial view of the facts and may often be deprived of the means of ascertaining the truth. Courts of justice have established the principle that such evidence is admissible for the accused, whenever he sees fit to offer it, and so long as that rule continues in force it must of necessity be competent for the government to introduce countervailing proof."

The authorities from other jurisdictions hold generally to the same view. (*Hopps* v. *Illinois,* 31 Ill. 385 [83 Am. Dec. 231]; *State* v. *Jones,* 50 N. H. 382 [9 Am. Rep. 242]; *Smith* v. *State,* 95 Miss. 789 [Ann. Cas. 1912A, 23, 27 L. R. A. (N. S.) 461, 49 South. 945]; 1 Wigmore on Evidence, sec. 228.)

In the case of *People* v. *Donlan,* 135 Cal. 489 [67 Pac. 761], this court adhered to the same rule, the court saying: "It is claimed on the part of appellant that this testimony was irrelevant and had a tendency to prejudice the minds of the jury. If the evidence tended to establish the facts constituting the offense charged in the information—that is, that the acts of the defendant were the acts of a debased and murderously inclined person, instead of those of a madman or one insane—it was right and the duty of the people's attorney to offer such evidence, and the court

did not err in admitting it. The purpose was not to prejudice the minds of the jury, but rather to convince them of the truth of the acts charged. The evidence tended to show a motive for the homicide, and that the acts of defendant were inspired by hatred and revenge, and were not those of an insane person. The evidence, therefore, was relevant, and tended to show that defendant was sane at the time of the commission of the offense charged." (See, also, *People* v. *Willard*, 150 Cal. 543 [89 Pac. 124].)

The appellant cites the two cases of *People* v. *Oppenheim*, 156 Cal. 733 [106 Pac. 74], and *People* v. *Harris*, 169 Cal. 53 [145 Pac. 520], as supporting his contention as to the inadmissibility of this character of evidence. In the first of these cases the question arose over the attempted cross-examination of the defendant himself as to certain particular acts for which the court held no proper foundation had been laid. In the other case, the question arose out of an apparent attempt on the part of the defendant to prove his own good character in respect to truthfulness and honesty by a question asked of his mother as to whether she had always known him to be truthful and whether she had ever known him to steal anything. This court upheld the action of the trial court in refusing to admit this evidence and in doing so said: "It is the rule as claimed by appellant that when the insanity of an accused is interposed as a defense, his acts and conduct and declarations made a reasonable time before and after the alleged criminal act is committed may be given to the jury on the question of his insanity at the time the criminal act was committed if they appear to have any tendency to show his mental condition at that time. (*People* v. *Willard*, 150 Cal. 544 [89 Pac. 124].) But here the question proposed did not indicate in the slightest that the conversation sought to be elicited would have any such tendency."

In the case of *United States* v. *Holmes, supra*, the distinction is clearly pointed out between the admissibility of evidence of particular acts of a defendant for the purpose merely of proving good character and its admissibility when offered upon the issue of the defendant's insanity at the time of his commission of the crime.

[2] The appellant finally urges certain acts of alleged misconduct on the part of the district attorney in the course

of his argument of the case. Most of the objectionable matter in the address of the district attorney occurred during the course of his comments upon the evidence which had been presented concerning the particular acts and conduct of the defendant as indicating him to be a sane but evil-minded man. As to nearly all of these remarks no objection was urged at the trial and no request made for an instruction thereon. It is too late now to urge misconduct as to these matters as to which, if prompt objection had been made, their prejudicial effect, if any, might have been obviated by their withdrawal or by a suitable instruction from the court to the jury to disregard them. As to any objections which were made at the time to the remarks of the district attorney, the record shows that the court did admonish the jury at the time to disregard the obnoxious statements of the district attorney. We perceive no reversible error as to these matters.

The foregoing covers all of the points urged by the appellant for a reversal of the case. We find no merit in any of them. The record in this case, taken as a whole, sufficiently shows that the defendant, as the consummation of an evil and immoral life, committed a willful, premeditated, and unprovoked murder, and that he has been fairly tried and lawfully convicted of his crime.

Judgment affirmed.

Lawlor, J., Waste, J., Shurtleff, J., Shaw, C. J., and Sloane, J., concurred.

WILBUR, J., Concurring.—I concur in the judgment of affirmance and in the main with what is said in the opinion of Mr. Justice Richards. An investigation as to the insanity of a defendant in a murder case may take as wide a range as the investigation of that subject in any other type of case, and the limitations to be placed upon this testimony is largely in the discretion of the trial court. (*Estate of Baker*, 176 Cal. 430 [168 Pac. 881].) The declarations of the defendant are admissible in evidence as verbal acts tending to show the mental condition of the defendant. The fact that such declarations might tend to degrade the character of the defendant or excite prejudice against him is no reason for excluding the evidence. A de-

fendant who has placed his mental condition in issue and who admits that he committed the criminal act charged against him opens the door to the widest possible investigation of his mental status, and he cannot complain of the fact that the people present and rely upon evidence which is inconsistent with his theory as to his insanity.

The defendant claims that he is suffering from a type of insanity known as paranoia. This type of insanity always manifests itself by one or more delusions. The delusion apparently relied upon by the defendant in this case is that he was wronged by the man he killed. The evidence is insufficient to establish that such belief was an insane delusion, for the evidence clearly shows that the defendant believed, and had reason to believe, that the deceased and Mrs. Peirano entered into a conspiracy to compel the defendant to marry Mrs. Peirano and that in the course of this conspiracy the deceased took advantage of the fact that the defendant was having meretricious relations with the woman by himself causing the woman to become pregnant and then prompting the woman to claim that the child was begotten by the defendant and to demand that the defendant marry her for that reason. As ground for this belief the defendant knew that Cox had asked him to marry Mrs. Peirano about the time the child was begotten; that when it was born Mrs. Peirano gave the defendant's name as the father of the child and demanded that he marry her and that the woman persistently refused to show the defendant the child, although he agreed to marry her if the child appeared to be his. After nearly five years' effort to have the birth certificate changed, the defendant on the day the murder was committed was completely baffled in his efforts to obtain redress by having Mrs. Peirano arrested. Immediately after the refusal of the district attorney and sheriff to act he procured the gun and killed Cox, the other member of the conspiracy. It is evident that the defendant's conclusion that he had been wronged by Cox was not an insane delusion, for it was based upon reason and facts.

I feel that I do not sufficiently understand the sex psychology of an illicit triangle of love and passion to join in the statement of the majority opinion in that regard. As I understand the main opinion, it advances the theory that the defendant killed Cox because he thought the

woman showed Cox a higher degree of love than she did him; but it appears that both Cox and the woman wanted the defendant to marry her and both claimed that he was the father of the child. The defendant seems to have believed that he was the victim of too great a demonstration of affection instead of too little.

I do not concur in the concluding paragraph of the main opinion because I do not feel that we are called upon to pass judgment upon the previous life of the defendant.