HENRY SINGLETON *v.* THE STATE.

1. MURDER. *Life imprisonment on former conviction. No bar.*

> It is no defense to an indictment for murder that when the crime was committed accused was undergoing sentence of imprisonment for life on a former conviction of murder.

2. SAME. *Declarations. Unsigned letter. Evidence of motive.*

> On a trial for murder committed by an inmate of the penitentiary, an unsigned letter, found at the place of killing a few minutes after the homicide, in the handwriting of defendant, and addressed to the warden, expressing a determination to commit the crime, and showing a motive therefor, is admissible in evidence against the accused.

3. MURDER TRIAL. *Insanity. Absence of evidence. Instructions refused.*

> On a murder trial, where there is nothing suggesting a doubt of defendant's soundness of mind, unless it be merely the enormity of the crime, it is proper to refuse instructions submitting to the jury questions as to his sanity.

FROM the circuit court of the first district of Hinds county. HON. J. B. CHRISMAN, Judge.

Appellant, a negro, was convicted of murder, and imprisoned in the penitentiary for life. While serving such sentence within the prison walls, he killed one Lulu Payne, colored, also a penitentiary convict, and was indicted for her murder. To this indictment he pleaded in abatement the fact of his former conviction and sentence, and that he was undergoing life imprisonment, wherefore it was averred that the court had no jurisdiction to try him for the second offense. A demurrer to this plea was sustained, and the defendant was tried upon plea of not guilty.

The evidence showed that criminal intimacy existed between defendant and the deceased, and that he became jealous of one Taylor, another convict, whom he suspected of intimacy with the woman. At the time of the killing, the deceased and other female convicts were at the cistern in the prison yard. Defendant had armed himself with a long dirk, and, coming from the shop, he walked rapidly to the cistern, and catching the woman with one hand stabbed her to death. At this juncture he was seized by others, when he threw down the knife, and, taking a razor from his pocket, cut his own throat, evidently intending suicide, but, under surgical treatment, his life was saved.

Several weeks prior to the killing it was observed that he was somewhat moody and morose. He had a violent temper, and was difficult to control. At the time of the tragedy he made no remark to the deceased, but his actions indicated that he was frenzied with rage. A few minutes afterwards there was found on the gound, near the scene of the killing, and at a place by which the defendant was taken when being removed to prison, a letter without signature or date, but in the handwriting of the accused, addressed to the warden of the penitentiary, as follows:

"*Capt. M. L. Jenkins:*

" SIR—You will please write to my cousin and tell him of my death and he has got fifty-one dollars and thirty-five

cents of my money, please collect it or get it from him & burrie Lula Payne and me deacon.   I had rather not live any longer. My cousin has got my money & he wont send it to me.   I think that he has swindled me out of it.   I have no friends to ever get me out of here, I am working turning a' crank with a saw on it the work will kill any man that live, I know it will kill me.   I got sick and unable last Saturday week to work.   Mr. Lary fastened me up in my sell all day Saturday & Sunday because I was unable to work, he dont like me in the shop and Mr. McGee is trying to work me to death for spite, thats why I had rather die.   I have been giving Lula every thing she wanted for six months and now she is flirting with the cook Taylor & her & I quarreled about it & she called the seargent to have me locked up & had rather die than to be locked up.   I will send her off first then I will go after her, I will send her to hell shure then I will go.   I rather be in hell than to be locked up or worked to death, come to the shop and try the crank saw that I am turning and you will see that I am working unreasonable I cant stand and no other man can, writ to my sister at Natchez & inform her of my death.   Her name is Mary Singleton and you will oblige me, tell her that Poke has robbed me of my money that was left by my poor old father.   Lula will never eat any more stake Taylor give you or write any notes."

This letter was introduced in evidence over the objection of defendant's counsel.

There seems to have been no fresh quarrel between accused and deceased, and no motive for the killing was shown other than jealousy.   He testified that he was jealous, and, further, that about three months before the homicide an agreement was made between deceased and himself to the effect that if either was untrue to the other, the guilty party was to be killed and the survivor was to commit suicide; that the woman had been untrue, and, carrying out the agreement, he had killed her and tried to kill himself; that at the

time of the killing he was "all to pieces," and "did not
know what got into his head." Asked if he knew it was
wrong to kill the woman, he said he did not think at the
time; that he was sorry afterwards, but at the time did not
know what possessed him.

Among other things, counsel for defendant asked the court
to instruct that the jury should be satisfied beyond a reason-
able doubt of defendant's sanity before convicting him; that
if the evidence failed to satisfy the mind beyond a reasonable
doubt that the accused knew right from wrong, or that he was
committing a crime, he should be acquitted; that the burden
of proof was on the state, and never shifted, and that defend-
ant's soundness of mind was a material fact, to be established
beyond a reasonable doubt; that if a reasonable doubt of his
sanity arose out of the evidence on either side, the jury should
acquit. These instructions were refused.

Defendant was convicted, and received sentence of capital
punishment. Motion for a new trial overruled; hence this
appeal.

*M. M. McLeod*, for appellant, by appointment of the court.

1. Did the court have jurisdiction? The accused was al-
ready a convict under life sentence, and was civilly dead.
Constitution 1890, § 241; Code 1892, §§ 212, 1076, 1078, 1455,
1562, 2218, 2747; 36 Miss., 72.

The second indictment of one already dead in law is a vain
thing. 2 Hawkins' P. C., p. 524.

After conviction, a prisoner cannot be indicted as long as
he remains unpardoned. *Ib.*, p. 253. In 67 N. Y., 218, and
49 Mo., 282, the contrary was held, but under special stat-
utes cited in the opinions. There is no statute giving such
authority in this state, and, under the common law, it is sub-
mitted that this prosecution cannot be maintained. 4 Black-
stone's Com., 336.

2. It was error to admit the letter in evidence. This pa-
per was not shown the defendant, and it was never proved

that he placed it where it was found. Outside of the paper itself, there was no sufficient evidence to prove that it expressed the defendant's intention to kill deceased. This letter was prejudicial to the accused, and was calculated to impress the jury with the idea that the defendant had malice or a motive to kill.

3. Under the four instructions asked by the defendant, the theory of the defense which was sought to be submitted to the jury was that the accused, at the time of the killing, was laboring under a fit of transitory frenzy; that he was not sane, and did not know what he was doing. The only question is, whether the principles stated in the instructions were applicable under the evidence. Did the testimony engender a doubt of the sanity of the accused sufficient to justify the application of these principles? It is submit·ed that there was sufficient evidence, at least to raise a doubt as to the sanity of the accused. This being true, it is well settled that it devolves on the state to remove such doubt. 56 Miss., 269. The state did not do this, but ignored all the evidence on the question of sanity. I respectfully urge that this was error requiring a reversal. As to this matter, the court passed on a question that should have been submitted to the jury. There are many authorities on the question of transitory frenzy, mental alienation, and like subjects. I refer the court specially to the case of *Garvin* v. *Commonwealth*, which is found in the Alienist and Neurologist, vol. 15, p. 104. This exhaustive thesis, with many cases referred to therein, sustains the position that there is, under the evidence, doubt of the sanity of the accused at the time of committing the crime. This being true, such doubt cannot be ignored.

*Frank Johnston*, attorney-general, for the state.

The plea in abatement proceeds upon an entire misconception of the doctrine of *autrefois attaint*. Even under the ancient common law, this case would not come within the rule allowing this plea. 1 Chitty's Crim. L., 464; 4 Black-

stone's Com., 336. The doctrine has never been applied except where a second conviction would. have been useless and superfluous. The fact that the accused is under a sentence of imprisonment for life for one murder, does not give him immunity from the graver penalty for the commission of another murder. 1 Bish. on Cr. L., § 1070.

2. The letter was competent testimony as declarations of the accused, and as showing his motive in committing the crime. It was fully identified. There is no doubt whatever, under the facts, as to his guilt, and the letter was really superfluous, except to show motive, which was jealousy.

3. The court properly refused the instructions asked by defendant on the subject of insanity. They were wholly inapplicable. There was no evidence whatever tending to show that the defendant was insane. He was moody and discontented, and had a grievance, and considered himself ill treated, but this is not evidence to sustain the theory upon which the instructions were based. The metaphysical theory of emotional insanity, or an uncontrollable impulse to commit crime, is rejected by the courts.

Argued orally by *M. M. McLeod*, for appellant, and the attorney-general, for the state.

CAMPBELL, C. J., delivered the opinion of the court.

The objection that the prisoner was not amenable for the murder committed while he was a convict under sentence of imprisonment for life for a former murder, is without support in principle or practice here or elsewhere, at the present time or in any former period of which we have any account. At a former day in England, because of the *attainder* consequent on conviction of .felony, the doctrine was that a plea of *autrefois attaint* was a bar to prosecution for another felony of the same grade, for the reason that " a second trial would be wholly superfluous. Where, therefore, any advantage, either to public justice or private individuals,

would arise from a second prosecution, the plea will not prevent it, as where . . . the punishment will be more severe," etc. 1 Chitty's Cr. L., 464; 4 Blackstone, 337; 2 Hale's P. C., ch. 32; 2 Hawkins's P. C., ch. 36.

The idea seemed to be that it was vain and useless to try a man already a convict and to suffer the very same consequences as would follow a second conviction, but, if public justice could be served by a severer punishment or a more extensive forfeiture, or otherwise, the plea of former attaint was not good. Even when the plea was available in England, as stated, it would not have been good in the state of case here presented, and the courts would have repudiated the monstrous proposition that one sentenced for life was privileged to kill his fellow-men with impunity. Long ago, the plea of former attaint as spoken of, was abolished by statute in England. It never was recognized in this country, so far as can be learned, except in Tennessee in 1827, as shown by the case of *Crenshaw* v. *State*, Martin & Yerger's Rep., 122, where it was held that a conviction, judgment and execution upon one indictment for a felony not capital is a bar to all other indictments for felonies not capital committed previous to such conviction, judgment and execution. Even that curious decision is not a precedent for the plea relied on in this case. In the remarkable opinion of Judge Catron in that case is an account of the case of one Stone, in England, who was hanged for murder, although he was attaint for felony and invoked that as a protection in the trial for murder. So it may be confidently affirmed that no adjudged case, and no statement by any text-book, can be found to sustain the plea in this case.

The plea of former attaint, as formerly known in England, has been expressly repudiated in some cases (*State* v. *McCarty*, 1 Bay, 334; *Hawkins* v. *State*, 1 Porter, 475), and generally understood not to be admissible in this country. It could not be, for the reason that attainder and corruption of blood, and the consequent forfeitures resulting from convictions

under the common law do not exist in this country, and cannot under the constitution, and, therefore, the supposed principles which sustained the plea of *autrefois attaint* can have no application with us, which, strangely enough, was overlooked by the Tennessee court in the case cited. The learned author of Walker's American Law, a most valuable elementary book, says: "There cannot bè, in this country, such a plea as a former attaint, because there cannot be attainder." See page 693. In several standard works on criminal law, no allusion is made to *former attaint* as a plea to an indictment.

We have shown that, under the common law, the plea here relied on was unavailing, and that the common law as to *former attaint* is not in force here. The question presented by the plea here is, whether a sentence to imprisonment for life licenses the convict to murder with impunity, and surely all must agree to a negative answer to this question. The idea that, because a convict is under many disabilities, he may commit crime as he has opportunity, without punishment, is untenable. If civilly dead, he is corporeally alive, is under the protection of the law, and answerable for what he does just as if under no denial of civil rights; and so it has been expressly held in cases just like this. *State* v. *Connell*, 49 Mo., 282; *Thomas* v. *People*, 67 N. Y. (22 Sickels), 218. If it had never been so held, we would reject the monstrous proposition of immunity to a convicted felon from punishment for his after-crimes, and hold him amenable for them as if he had not been convicted.

We see no error in admitting in evidence the letter proved to be in the handwriting of the prisoner, and we approve the refusal of the instructions asked by the prisoner. There is no evidence on which to base them. Nothing suggests a doubt of his sanity, unless it is the enormity of his crime, and it would be unsafe to indulge a presumption of a want of sanity from that alone, in view of the authoritative declaration that "the heart is deceitful above all things, and des-

perately wicked; who can know it?" A long list of cases prove the wickedness of men in the commission of the most heinous crimes. The testimony of the prisoner himself furnishes a clue to explaining his terrible deed. It was prompted by jealousy, and "jealousy is the rage of a man; therefore he will not spare in the day of vengeance." We are told that "love is strong as death; jealousy is cruel as the grave;" and, applying these sayings to the account given by the prisoner of his relations to the woman in the case, a solution is found of the horrible crime committed.

*Affirmed.*