## HINTON *v.* STATE.

In Banc. April 10, 1950.

No. 37480 (45 So. (2d) 805)

Suggestion of Error Overruled May 22, 1950, (46 So. (2d) 445).

Appeal dismissed and certiorari denied in the Supreme Court of the United States, October 10, 1950, (340 U. S. 802).

Bidwell Adam and O. L. McLeod, for appellant.

**George H. Ethridge**, Assistant Attorney General, for appellee.

Lee, J.

Murdock Hinton was indicted by the grand jury of George County for the murder of J. E. Nelson. A change of venue was granted to Stone County. On the trial, the jury returned a straight verdict of guilty of murder. From a judgment and sentence to death by electrocution, he appeals.

Hinton was 45 years old, and the father of seven children. He experienced marital difficulties, and his

wife divorced him. His eldest daughter Gloria Jean, 18 years old and unmarried, had given birth to an illegitimate child—a daughter. On December 21, 1948, the family was living near Lucedale in George County, whereas Hinton was staying with his mother in Jackson County. On that day, a relative, who was working in the vicinity, was going to make a trip to Lucedale, and Hinton asked to ride there with him. They went by Larson's store, where he picked up a package, wrapped in red paper. It was a box of twelve gauge shotgun shells, which Hinton told Larson that he was buying for a Christmas present, and asked him to wrap up as such. Hinton carried the rest of the paper away to wrap up another present—a shotgun. Going from the store to his mother's house, he there picked up the shotgun, wrapped as another Christmas present.

The trip was made, and Hinton got out of the car at the Rock House, a relatively short distance from his wife's home. About 5:30 o'clock that afternoon, a neighbor heard three shots at the Hinton home, and shortly thereafter, Gloria Jean came to his house, excited, and gave him a report thereon. This neighbor called Sheriff J. E. Nelson over the telephone, but was unable to locate him immediately. After several efforts, finally he contacted the sheriff and advised him of trouble at the Hinton home. About twenty minutes thereafter, this neighbor and his brother-in-law saw Sheriff Nelson's car pass, and observed that Gloria Jean got in the car a short distance from the Hinton home. These neighbors, believing that something serious had happened, started over to the place. But, immediately after Sheriff Nelson's car stopped in front of the gate, and the lights went off, they heard several shots, two in fairly rapid succession, and two subsequently. These neighbors proceeded no further, and immediately Hinton drove the car away, without turning on the lights.

Another neighbor had heard the report of shooting in the Hinton family, and observed the car as it drove up

in front of Hinton's gate. As a man got out of the car, a gun fired from over the fence, behind the car, and he immediately heard a voice and the groans of a man. He then saw a man cross over the road, fire again and the groans stopped. Hinton, whose voice he knew, then said, "I have got him". Immediately there were cries of a woman, and Hinton said, "Get out of there", with an epithet. Two shots were fired immediately—the racket all stopped—and Hinton left in the car without turning on the lights.

Several witnesses followed the car as Hinton was driving away, but did not overtake him. He made good his escape and was not apprehended until the following Christmas morning.

In the meantime, an investigation of the scene disclosed that Sheriff Nelson was lying close to the gate, dead, with twelve buckshot wounds in his back from the hips to the shoulders, and a round hole in the chest with powder burns, showing that the lethal weapon had been fired at close range. In the house were found the bodies of Mrs. Mattie Hinton and her little seven weeks old granddaughter, both of whom had met violent deaths from shotgun wounds on the same occasion. The wrecked automobile of Sheriff Nelson was found several miles away, and the body of Gloria Jean, who had also met a violent death from shotgun wounds was found therein.

Following his apprehension, Hinton made a voluntary statement to the officers in which he gave this version: He had planned the killings since October the 13th, the day his wife got her divorce. He intended to present them a present on Christmas morning, but decided they would not be at home at that time. So, he made it up to do the work that day. When he went to the house, his wife and his daughter's child were there. He killed his wife and granddaughter and thought about the Sheriff arresting him again, and he did not propose to let him do it. Consequently he went across the road in front of the house, in the bushes, until the sheriff arrived. As

the sheriff got out of the car and pushed the door to and was looking toward the house, he shot him. He then walked up to the sheriff, as he was saying "Ouch, Ouch", and shot him again. The little boy in the car begged his father not to kill him, and Hinton said, "I will not", and told him to "Get out of the car and leave". He then shot his daughter in the car, and drove away, until it wrecked. He broke the back glass out with the gun, left the car, and escaped. When one of the bloodhounds came up to him in the woods, he made friends with him by patting him on the head.

On the stand, Hinton verified the purchase and wrapping of the shells, the wrapping of the shotgun and the trip to his wife's home. He admitted that he knew what he was doing. When he left the car at the Rock House, he unwrapped the gun and shells immediately after getting in the woods. As he approached the house, he was on the lookout for a rabbit or squirrel. When he arrived at the house, his wife tried to take the gun away from him, and it discharged hitting her in the leg. He then had a complete lapse of memory, he had no recollection of killing his wife, his granddaughter, Sheriff Nelson or his daughter. The next time he knew anything was when he waked up in a treetop, perhaps the next day.

The defense was insanity, and his sisters and mother testified that he was terribly upset and nervous prior to October 13th and thereafter. He complained that Sheriff Nelson got his daughter in her pregnant condition. His wife was running around with another man; and his home had been destroyed.

The psychiatrist, introduced in his behalf, replying to the hypothetical question of defense counsel, gave his opinion that Hinton was *insane* at the time of the killing, But, on cross examination, in response to a hypothetical question by the District Attorney, detailing the State's version, gave his opinion that Hinton was *sane* at the time of the killing.

The evidence for the State showed Hinton to have been well composed at the time of his apprehension, and he admitted that he was sane and knew everything up to the time when the gun fired as he and his wife were in a tussle.

Thus, with no substantial dispute as to the facts and circumstances of the killing—the defense thereto being insanity—we proceed to a consideration of the alleged errors of the trial court, assigned by appellant.

 The first of these was the failure of the court to instruct the jury to disregard the statements of three witnesses about appellant's connection with liquor.

This proposition came up in this way: Three sisters of the appellant testified to facts which, if believed, would tend to establish the insanity of the appellant. Among other things, they said their brother farmed for a living. On cross-examination, the District Attorney asked the first one if she knew what else he did to make money, and she replied, "He made whiskey". There was no objection and no motion to exclude. The second was asked if she knew of anything else (other than farming) that he did to make money, and she replied: "He fooled with a little bit of whiskey". There was no objection and no motion to exclude. The third was asked several questions as to whether she knew anything about his making whiskey around his or his mother's place, or carrying it to his place and selling it in Lucedale, and she replied that she did not. There was no objection and no motion to exclude. Another witness was introduced by the appellant, and after his evidence had been given, the court recessed for the day. The next morning, appellant moved the court to instruct the jury to disregard this evidence, which motion was overruled. In other words, the appellant, by this motion asked the court to instruct the jury to disregard evidence which had been heard the day before, and which he did not deem sufficient to object to at the time.

.

We do not see how a court can be put in error for this kind of a situation. Learned counsel represented both the state and the appellant. This record indicates that they were familiar with the case of Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A., N. S., 461, Ann. Cas. 1912 A, 23, wherein this court said: "Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence."

Under the rule in the Smith case, supra, this was not such a glaring error as to require the trial court to act of his own motion. This case is clearly distinguished from the case of Nelson v. State, 129 Miss. 288, 92 So. 66, 71. There, like inquiry was made, but the defendant objected, and the questioning was permitted by the court over his objection. There is this further fact about that case: The opinion adjudged error in the voir dire examination, introduction of declarations by the deceased before his homicide that he had been threatened, three separate instructions for the State, an instruction given after argument was concluded, and the inquiry about liquor—seven different errors. It was said further that there was no confession by the defendant or admission against interest, and that it was a weak case. The court closed the opinion with these words: "We do not mean to be understood as holding that each of the errors committed by the court is a reversible error. We simply hold that, under the facts of this case, considering the errors committed all together, it is clear that appellant should have another trial."

We, therefore, find no justification for a reversal of this case on that assignment.

Appellant complains of the action of the trial court in allowing the State, in rebuttal, to introduce evidence of the general reputation of the deceased for morality and virtue.

In passing to this discussion, it might be observed, at the outset, that the objections and motions to exclude were based solely on the incompetency, irrelevancy and immateriality of this evidence. No particular reason was given the court to show that such evidence fell into that category. In other words, the objections were general.

We are mindful that the general reputation of the deceased for peace in a murder trial cannot be shown until or unless such reputation is first attacked by the defense; and that the same rule applies to the injured party in the lesser offense of assault and battery with intent to kill. Woods v. State, 90 Miss. 245, 43 So. 433; Richardson v. State, 123 Miss. 232, 85 So. 186. But the principle there involved is not determinative of the question here. This case presents an unusual situation. The defense was insanity. Smith v. State, supra.

It was a fact that the deceased had arrested the appellant and placed him in jail several times. He told the officers, after arrest, that he killed the deceased because he did not want to be arrested again. He also told them that a boy in Florida was the father of his daughter's child. However, on the stand, he said that his wife and daughter had previously told him that the deceased was the father of the child. If they had told him such, that fact was proof that it was altogether improbable, under the circumstances of this case, that he was insane, but rather that he committed the act out of malice and revenge. The wife, daughter and Nelson were dead. If answer were to be made to this accusation, it could be rebutted only by the declarations of the daughter at childbirth, and the general reputation of the deceased in the trait of character, negativing such conduct on the part of the deceased. If the general reputation of the deceased in this trait was good, that fact was substantial evidence that the wife and daughter did not tell the appellant that the deceased was the father of the child. If they did not tell appellant that the deceased was the father of the child, that fact was substantial evi-

dence that appellant did not kill deceased for such reason, but rather because he had already killed his wife and infant granddaughter and did not mean to be arrested for these crimes, thereby constituting evidence of a cold, calculating and deliberate design to kill, and unveiling the defense of insanity as a sham and pretense by which he hoped to escape punishment, or palliate the enormity of his crime.

On the contrary, when the State offered proof which tended to establish the falsity of the charge that the deceased was responsible for the unfortunate condition of his daughter, and if, in fact, the appellant actually had any such impression in his mind, it might be said that the State, by such proof, in a measure, helped to build up the existence of a hallucination on his part, and thereby, in a measure, contributed to his defense of insanity.

This evidence appears to have been germane to the issue. But if, under all of the circumstances, there was error in this respect, we hold that it was harmless.

The confession was properly admitted. The three instructions for the state correctly announced the law. The instructions for the defendant were liberal. The court indulged great liberality toward the appellant in the admission of his evidence.　■■　The jury were amply sustained in rejecting the theory of insanity; and when that defense was found to be insufficient, the homicide became, beyond reasonable doubt, a most dastardly murder. A jury composed of fair and honest men could have reached no other verdict.

The infliction of capital punishment is a serious responsibility. Under our law, the penalty for murder is death, unless the jury fix the punishment at life in the penitentiary, or certify that they are unable to agree upon the punishment. There is no better system than to allow the triers of the facts the right to find such facts as, in their good judgment, extenuate the killing. We find no sound reason to disturb the solemn verdict of the jury.

Accordingly, the cause is affirmed, and Friday, May 26, 1950, is hereby fixed as the date of execution.

**Hall, J.** (concurring).

I concur in everything said in the controlling opinion in this case. I wish to point out, however, that after appellant had made a confession wherein he had stated that someone other than the sheriff was the father of his daughter's illegitimate child, he took the stand and testified that his daughter and wife had both told him that the sheriff was its father. In this manner he attacked the character of his victim. His wife, daughter and the sheriff were all dead and there was no means whereby the prosecution could rebut this attack upon the sheriff except by bringing in witnesses, as it did, to show his good character. It is, of course, improper for the state to bolster its case in chief by showing the character of the deceased, but when the defendant attacks the deceased's character, as he did in this case, it was proper in my opinion for the state to rebut the attack in the manner which was done here.

**Alexander, J.** (specially concurring).

I am of the opinion that the guilt of the defendant is too evident for us to withhold affirmance on account of the alleged error. However, I am of the view that the testimony showing that the defendant had manufactured whiskey and the testimony as to the good moral character of the deceased sheriff was not relevant or competent; and if the case were a closer one on its facts, the prejudicial effect of this testimony would bulk large.

On Suggestion of Error.

**McGehee, C. J.**

The original briefs filed before this case was decided on April 10, 1950, together with the entire record of the

proceedings and testimony, have been carefully re-examined, and we have given full consideration anew to the questions raised by the suggestion of error and the brief filed in support thereof with the view of determining whether or not either the conviction or the imposition of the death penalty was brought about in whole or in part by the admission of the testimony complained of.

A majority of the Judges are of the opinion that it was not error for the Court to have overruled the motion of the defendant to exclude the statements of two of his witnesses, one of whom said that ''he made whiskey'' and the other of whom said ''he fooled with a little bit of whiskey'' made in response to an inquiry by the district attorney as to what else (besides farming) he did to make money, and the Judges who are of the opinion that the motion to exclude these statements should have been sustained do not think that the failure of the trial court to do so would constitute reversible error for the reason that the statements could not have been prejudicial to the defendant in view of all of the very damaging and incriminating testimony which had already been introduced and was fully competent. This is likewise true as to the question asked by the district attorney of the other sister of the defendant when he inquired specifically as to whether she knew anything about his making whiskey around his or his mother's place, or carrying it to his place and selling it in Lucedale, and to which question she replied in the negative.

We are also of the opinion that the case should not be reversed because of the introduction of witnesses by the state who testified as to the good character and reputation of the deceased sheriff for morality and virtue, since this testimony tended to show the improbability of a belief on the part of the defendant, or that he had been so informed, that the sheriff had been guilty of immorality with defendant's daughter whereby his character and reputation for morality and virtue was sought to be impugned. At any rate, the Court is unable to say with

any degree of confidence that the exclusion of such testimony would have resulted in a different verdict being rendered by the jury.

The defendant was ably represented by counsel, and there was no lack of diligence on their part to safely guard the constitutional and other legal rights of the defendant by timely objection to testimony or otherwise, and it was not intended to be otherwise intimated in the former opinion, and we think that the verdict was based upon the facts and circumstances testified to in regard to the homicide itself, and that there was no error committed on the trial that resulted in the denial to the defendant of due process of law, and the Court is therefore of the opinion that the suggestion of error should be overruled.

Suggestion of error overruled.