ROGERS v. STATE.

No. 39466 January 10, 1955 76 So. 2d 831

*Cason Rankin,* Tupelo, for appellant.

*Wm. E. Cresswell,* Asst. Atty. Gen., Jackson, for appellee.

Lee, J.

From a conviction of burglary, with a sentence of two years in the state penitentiary, James Rogers appealed.

Unfolding the facts in chronological order, they are as follows: On Thursday, June 25, 1953, N. L. Conwill locked his dwelling house, left the key with a neighbor, Willie Copeland, and made a trip to Chicago, Illinois. He returned on the following Wednesday, and the next morning, noticed that a window had been torn, the hinges had been pried off, and at least fifty pounds each of ham and beef, of the value of 50c a pound, had been taken from the deep freeze in a side room of the house. The neighbor, with whom he left the key, did not get the meat.

An investigation was begun, and a few days later, Rogers made a free and voluntary confession in the presence of Conwill, the sheriff and two deputies, that he, on Friday after Conwill left on the trip, opened the window screen, pried the hinges off the window, went in the house, and got as much ham and beef as he could carry away in a sack. Thereafter on July 10th, Rogers was admitted to the insane hospital at Whitfield. However, after observation and examination by the full staff on July 23rd, he was held to be without psychosis, and was discharged on the 28th of the month. He was again admitted on February 14, 1954, but after observation and examination by the entire staff on February 23rd, he was again found to be without psychosis, and on February 28th, he was again discharged.

In the meantime, on February 22, 1954, the grand jury returned an indictment in two counts, charging burglary and larceny, that is, the breaking and entering of the house, and the taking of the meat.

When the case was called for trial on March 1st, counsel for defendant filed a suggestion of present insanity, with an offer to submit evidence. Two days later a jury was empanelled to try that issue.

Four lay witnesses testified that the defendant would laugh when there was no occasion therefor, and also about certain other peculiarities; but they shied away from the expression of an opinion that he was insane. His father was somewhat stronger in his opinion as to sanity, and testified that the defendant's mother is crazy; that an aunt is not right; that a grandmother was crazy for about six months; and that two of his great-aunts were crazy.

For the State four lay witnesses, who had seen and observed the defendant over a long period of years, were of the opinion that he was not crazy. Dr. James Head and Dr. W. L. Jaquith, from the mental institution at Whitfield, testified in detail in connection with the defendant's two admissions to the institution; their diagnoses and those of the entire staff; that he was on the border line according to standard intelligence tests, but that he was without psychosis, and gave no evidence of insanity. Under an order of the court, they examined the defendant in the presence of his counsel for sanity that day, and, over the objection of his counsel, were permitted to testify that they found "no evidence of any insanity," and that, in their opinion, he was then rational enough to conduct a defense of his case.

The instructions for the defendant and the State required the jury to believe beyond a reasonable doubt that the defendant was then sane and capable of conducting a rational defense. The jury found that he was "presently sane and capable of conducting a rational defense in this case."

Two days later, another jury was empanelled to try the case on its merits. Like evidence, as heretofore detailed, was adduced by both the State and the defendant.

The jury was instructed that it could find the defendant guilty, not guilty, not guilty by reason of insanity, with a finding that he has since been restored to reason, or that he has not been restored to reason. The verdict was guilty as charged, with a recommendation of mercy.

■■■ The appellant contends that the court erred in admitting the confession because the corpus delicti had not then been proved.

At the time of the admission, the State had already proved that the house was securely closed when the owner left, and, on his return five or six days later, a screen window had been torn, the hinges had been pried off, and a large quantity of meats was missing, without his consent. This was substantial evidence that a burglary and larceny had been committed, and therefore established the corpus delicti. Yates v. State, 172 Miss. 581, 161 So. 147. See also Simmons v. State, 208 Miss. 523, 44 So. 2d 857. Consequently the confession was properly admitted; and when it was added to the evidence, which had been previously adduced, the whole was sufficient to establish the corpus delicti beyond a reasonable doubt. Simmons v. State, supra; Pope v. State, 158 Miss. 794, 131 So. 264.

■■■ Although the court permitted the State to reopen and offer additional evidence, after the defendant had moved for a directed verdict, this did not constitute error. The motion should have been overruled anyway, as the State had made out a sufficient case. Permission to reopen did not constitute an abuse of discretion. There was no prejudice from the action.. Lewis v. State, 56 So. 2d 397 (Miss.); Williams v. State, 26 So. 2d 64 (Miss.); Morris v. State, 148 Miss. 680, 114 So. 750; State v. Martin, 102 Miss. 165, 59 So. 7.

■■■ The indictment charged that the defendant "feloniously and burglariously did break and enter" the

dwelling house. Appellant contends that it was fatally defective because it did not contain the adverb "willfully." He cites no authority. The word is not in the statute. ██ Besides in burglary, where theft is the purpose, the breaking and entering must be with intent the goods and chattels of the owner then in said house feloniously and burglariously to take, steal and carry away. Draughn v. State, 76 Miss. 574, 25 So. 153.

██ The defendant objected to the testimony of Drs. Head and Jaquith as to the result of their examination, under order of the court, on the question of present insanity. The ground was that he was compelled to give evidence against himself, in violation of Section 26 of the Constitution.

The suggestion of present insanity necessitated the trial of that issue first. Williams v. State, 205 Miss. 515, 39 So. 2d 3; Musselwhite v. State, 215 Miss. 363, 60 So. 2d 807; Shipp v. State, 215 Miss. 541, 61 So. 2d 329; Pace v. State, 67 So. 2d 521. The relationship of physician and patient did not exist. Hopkins v. State, 212 Miss. 772, 55 So. 2d 467. Defendant had twice voluntarily submitted to an examination by these doctors at the mental institution. The burden was on the court to determine whether or not he then had sufficient capacity to conduct a rational defense. These witnesses were experts in their field. Obviously they were in position to give more reliable information than lay witnesses. If there was any substantial basis for the claim of present insanity, or if the same was not feigned, they were qualified to ascertain and find out about the matter, which, of course, would redound to the benefit of the accused. It would be an anomaly indeed to charge a court with the responsibility of determining whether or not an accused has sufficient capacity to conduct a rational defense, when he is called to the bar to answer for a crime, and then make it impossible for the court to discharge its responsibility by denying to it the right and power to ap-

point expert witnesses to aid the court in quest of the truth. Such right and power must be held to be inherent in the court.

Brooks v. State, 209 Miss. 150, 46 So. 2d 94, is not in point, for, in that case, the examination by the sheriff and the doctor was unauthorized.

Attacks on the constitutionality of statutes, providing for examination of defendants by experts appointed by the court, on the ground of self-incrimination, have been rejected by many courts. See 32 A. L. R. 2d 441 and 444-5.

In State of South Carolina v. T. C. Myers, 220 S. C. 309, 67 S. E. 2d 506, 32 A. L. R. 2d 430, it was said: "While there are a few early cases to the contrary, it is now almost uniformly held that where insanity is interposed as a defense, the compulsory examination of an accused by experts for the purpose of determining his mental condition and testifying in regard thereto does not violate either the constitutional privilege of the accused of not being compelled to be a witness against himself or the constitutional guaranty of due process of law." The opinion cites a large number of cases upholding this principle.

In State v. Coleman, 96 W. Va. 544, 123 S. E. 580, it was said: "Ordinarily the result of a physical examination made without the consent of the accused is not admissible in evidence, but we find the weight of authority in this country is to the effect that where the defense of insanity is made, evidence of the facts disclosed by a physical and mental examination of accused by physicians either prior to or during the trial, with or without his consent, does not violate the constitutional privilege of accused not to be a witness against himself."

Also in Hunt v. State, 27 So. 2d 186, the Alabama Supreme Court said: "It is not doubted by any authorities that the doctors may testify to the present state of his (defendant's) sanity in their opinion as affecting the question of his condition in that respect at the time of the

alleged crime, although their knowledge as to his present mental status was acquired by examination had on the appointment of them as a commission to do so to determine whether he should be put upon trial."

Appellant complains of error in the refusal of the following instruction: "The court instructs the jury for the defendant that in order to sustain the defense of insanity it is not necessary that the insanity of the accused be established, by a preponderance of evidence; if, upon the whole evidence, the jury entertain a reasonable doubt as to the sanity of the accused at the time of the alleged crime they must acquit him."

■■■ The instructions for the state required the jury to believe from the evidence beyond a reasonable doubt that the defendant was "mentally capable of distinguishing right from wrong with regard to his act" before they could convict him, and that if he was able "to appreciate the difference between moral right and wrong as to the particular act," then the law holds him responsible. These instructions followed the rule which was stated in Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A. (N. S.) 461, which was reaffirmed in Eatman v. State, 169 Miss. 295, 153 So. 381, as follows: "In this state, as generally in the several states, the rule of law is that the test of criminal responsibility is the ability of the accused, at the time he committed the act, to realize and appreciate the nature and quality thereof — his ability to distinguish right and wrong."

Several lay witnesses were of the opinion that the defendant was sane. By agreement, the testimony of the doctors, which was taken at the first trial, was introduced, subject to the objection to so much thereof as was given as a result of the examination as to present insanity. ■■■ It is sufficient to say that the proof was ample to show, beyond a reasonable doubt, that the defendant was legally responsible.

For the defendant, one witness would not say whether he was sane or insane, nor would another know whether he was crazy or not, but he thought there was something wrong. Another witness said that the defendant "acts a little off," but he declined to express an opinion as to whether or not he was crazy. Still another said that he had "no right to say he's crazy," but he acted funny and curious, and he did not much believe the defendant was capable of judging the legal consequences of his acts. The father said that his son acts like he is crazy, and that there is something bad wrong with him, and that he does not know right from wrong at times.

The instruction did not attempt to define sanity or insanity — mere relative terms — and would have been confusing to the jury inasmuch as the State's instructions also did not define either sanity or insanity, but instead announced the correct measure of mental responsibility. Because of the failure to define sanity or insanity, the instruction was properly refused.

No reversible error was committed, and it follows that the cause must be, and is, affirmed.

Affirmed.

*Roberds, P. J.*, and *Hall, Kyle* and *Holmes, JJ.*, concur.