WILSON *v.* STATE

No. 42139 March 26, 1962 140 So. 2d 275

*Kelly McKoin*, Biloxi, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Lee, P. J.

Willie Wilson was indicted for the forcible and felonious rape of a female. The jury found him guilty as charged, and he was sentenced by the court to suffer the death penalty. From the judgment entered, he appealed.

Prior to the arraignment, defendant's counsel suggested in writing that his client was then insane and was not capable of making a rational defense, and that this issue should first be settled by a jury. In like manner, by a separate motion, he asked, in accordance with Sec. 2575.5, Code 1942, Rec., that the defendant be examined by a competent psychiatrist, to be selected by the court, in order to determine the defendant's ability to make a defense. Both motions were sustained, and Dr. G. T. Sheffield, a psychiatrist, was appointed to make the examination. A jury was empaneled, and, after hearing the evidence pro and con, returned the following verdict: ''We, the jury, find the defendant sane and mentally capable of conducting a rational defense.'' Without detailing the evidence, it is sufficient to say that it fully warranted the jury in returning such verdict.

Defendant's motion for a special venire was sustained, and, at the same time, namely, June 28, 1961, the venire was drawn returnable on July 5th thereafter.

On July 5, 1961, counsel for defendant presented a bill of exceptions to certain rulings of the court allegedly made during the sanity trial. The trial judge did not sign the same; but, on the bottom of the motion, he wrote these words: ''The Court Reporter's record shall be made a part of this Bill of Exceptions and when this is done the same shall then constitute the bill of exceptions as signed by me this 5th day of July, 1961, *as I*

*do not recall things happening the way counsel for defendant alleges."* (Emphasis supplied.)

The court also overruled the defendant's motion to quash the indictment on the ground that Negroes were systematically excluded from jury service in Harrison County.

On his appeal here, the appellant has assigned and argues four propositions: The trial court erred (1) in overruling his bill of exceptions to rulings allegedly made during the sanity trial; (2) in overruling his motion to quash the indictment; (3) in overruling his motion for a new trial based on the ground that the verdict of the jury was against the overwhelming weight of the evidence; and (4) in admitting evidence concerning a charge of armed robbery.

## THE BILL OF EXCEPTIONS.

Secs. 1531-1535, inclusive, Code of 1942, Rec., deal with the question of bills of exception. The trial judge refused to sign the proposed bill of exceptions, saying "I do not recall things happening the way counsel for defendant alleges." In other words, the truth of the case was not fairly stated therein. Sec. 1532 of the Code. Obviously the appellant is bound by the bill of exceptions as signed by the judge. If it in fact stated the truth of the matter, a way was open to the appellant to make it available, even though the judge did not sign it. Secs. 1533, 1534 of the Code. He did not avail himself of such remedy.

In another point, the appellant argues that the trial judge, before the selection of the jury had begun, remarked that defendant was charged with rape and armed robbery. He does not state where such remarks could be found in the record. The Court has not found it. Obviously, the trial judge, by his refusal to sign the bill of exceptions, adjudicated that this did not happen.

The appellant's complaint therein as to the competency of certain jurors is not sustained by the voir dire examination as shown in the record.

The appellant further said that the attorney for the State repeatedly referred to the fact that he had been indicted for the crime of rape. He mentions questions which may be found at pp. 17, 33, 56 and 57 of the record. In the first instance, during the cross-examination of the appellant's grandmother, who was trying to testify that he was insane, counsel for the State elicited from her that she had talked to her grandson on Sunday and she admitted that he told her that he had done wrong and he was sorry for it. In the second instance, the mother of the appellant told the District Attorney that her son looked then, during the trial, just like he did on Saturday before the offense happened on Sunday. In the third instance, during the examination of officer Eddie Van, the District Attorney asked if the witness had talked to the appellant on the night that this crime was committed that afternoon. The court corrected the question so as to say, "The alleged crime."

 █ Here was the situation: A suggestion of insanity had been filed. The court was engaged in an effort to determine whether the appellant was, at that time, of such mental capacity as to be able to consult with his counsel and make a reasonable defense. It is common knowledge in this jurisdiction that sanity trials occur in the circuit court only when insanity is a defense to a criminal charge.

 █ This Court in Smith v. State, 95 Miss. 786, 49 So. 945, 27 L. R. A., N. S., 461 held that: "Where the defense is insanity, general or partial, the door is thrown wide open for the admission of evidence; every act of the party's life is relevant to the issue and admissible in evidence", citing authorities. The same rule was applied in Eatman v. State, 169 Miss. 295, 153 So. 381;

Hand v. State, 190 Miss. 314, 200 So. 258; Hinton v. State, 209 Miss. 608, 45 So. 2d 805, appeal dismissed and certiorari denied in the Supreme Court of the United States, 340 U. S. 802, 71 S. Ct. 68, 95 L. Ed. 590; Denham v. State, 218 Miss. 423, 67 So. 2d 445. The Smith case, supra, was also cited in Elmore v. State, 143 Miss. 318, 108 So. 722; Hoye v. State, 169 Miss. 111, 152 So. 644; Pullen v. State, 175 Miss. 810, 168 So. 69; Williams v. State, 185 Miss. 449, 188 So. 316; Carter v. State, 199 Miss. 871, 25 So. 2d 470; Ratcliff v. State, 201 Miss. 259, 29 So. 2d 321; Lewis v. State, 209 Miss. 110, 46 So. 2d 78; Rogers v. State, 222 Miss. 690, 76 So. 2d 831; Johnson v. State, 223 Miss. 56, 76 So. 2d 841, 81 So. 2d 558; Keeler v. State, 226 Miss. 199, 84 So. 2d 153; Burr v. State, 237 Miss. 338, 114 So. 2d 764.

 Manifestly the bill of exceptions was both imperfect and insufficient. Under the foregoing authorities, there was no error in overruling it.

## THE MOTION TO QUASH THE INDICTMENT.

 The defendant, on his motion to quash the indictment, called two witnesses, Ewart D. Lindsey, Circuit Clerk since May 10, 1948, and Boyce Holleman, District Attorney since February 8, 1953. Lindsey, at the instance of defendant, described how the names of potential jurors were actually selected by the supervisors in accordance with the statutes of the State; that those names were recorded on the minutes of the board of supervisors; that a copy of such list was delivered to the circuit clerk; and that the clerk placed such names in the jury boxes and sealed them. He explained that the application for registration provided no place to show the color of the applicant. Neither "white" nor "colored" appeared in such applications. He estimated that about 29,000 white and about 2,300 colored persons were duly registered. He said that Negroes had served on grand juries in such capacities

since he has been in office. Two had served on the first grand jury, and he recalled that others, since that time, had served on the grand jury. He said that, when the slips are put in the boxes, there is no way to tell whether the individual is Negro or white; and that there was no discrimination shown between the races in the drawing of the panels. During his tenure of office, he has observed a number of Negroes serving on the juries. There was nothing, prior to the time when they came into the courtroom, to designate jurors by race. He further said that, in proportion to the number of white and colored voters, the number of Negroes selected for jury service at least equaled, if it did not exceed, the proportionate number of white jurors. He knew that the names of Negroes were in the jury lists and boxes in his office at that time.

Boyce Holleman testified that quite a number of Negroes have served on the grand jury during his term of office. He remembered the names of two who served at the December 1959 and the June 1960 terms, and another at a different term which he could not remember. The witness sat in the grand jury room with each of these jurors for a week and talked to them a number of times. He said that a number of colored men had also served on petit juries and that two served during the past week. He said that there was no discrimination in the grand jury room. The Negroes performed a valuable function; and that Negroes have actually been accepted and served on juries. He remembered that one was accepted and served in the deliberations. Either the last week or the week before, two, whose names he gave, served. He remembered a number of such colored persons by face, who had served, but he did not remember their names. He remembered five or six who served on the grand jury whose names he could not give. The trial judge made the following statement in reference to this question: ''Of course the Court also

has knowledge of the fact, having served during the last few years, that negroes have served on the Grand Jury in Harrison County, as well as Petit Jury. As a matter of fact, I have noticed of late that it would be an exception not to have a negro on the Grand Jury. We ordinarily do have one on the Grand Jury.''

The evidence of the only two witnesses whom the appellant placed on the stand on this issue, instead of sustaining the allegations of the motion, affirmatively showed that there was no discrimination whatever, and that Negroes had for a number of years · been listed for jury service and that they had actually served on both grand and petit juries. Appellant, therefore, did not meet his burden. His witnesses proved that the converse of his motion was true. Akins v. Texas, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692; Cf. Hernandez v. Texas, 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866. See also Kennard v. State, 128 So. 2d 572, not yet reported in the State Reports, and the authorities there cited. In the case of Johnson v. State, 223 Miss. 56, 76 So. 2d 841 81 So. 2d 558 (1955), there was a like motion to quash. Ewart D. Lindsey was the only witness in that case. The opinion said that the testimony of Lindsey ''shows without dispute that there has been no systematic exclusion of Negroes from juries in Harrison County, and that, in fact, at practically every term of court Negro jurors are drawn out of the box; and that no effort was made to discriminate either in selecting jurors for the box or on the particular grand jury and petit jury involved in this case, but appellant makes no showing whatever that there was any systematic exclusion of the names of Negroes from the jury box or panels. In fact, the evidence offered by appellant is to the contrary and negatives his allegation.'' The Supreme Court of the United States, on May 31, 1955, denied the petition of Johnson for a writ of certiorari. Ibid.

This Court, in Cameron v. State, 233 Miss. 404, 102 So. 2d 355, stated that since the decision of the United States Supreme Court in Patton v. Mississippi, 332 U. S. 463, 68 S. Ct. 184, 186, 92 L. Ed. 76, it is a matter of common knowledge that members of the boards of supervisors in most, if not all, of the counties of this State have been placing in the jury boxes the names of Negroes who meet the requirements of being men of good intelligence, sound judgment and fair character, and who do not possess the disqualifications enumerated in Section 1762, Mississippi Code of 1942. The same opinion recognized that it is not required that all the names of Negroes be placed in the jury box. This fact was reiterated in Kennard v. State, supra.

### THE VERDICT OF THE JURY — WAS IT CONTRARY TO THE WEIGHT OF THE EVIDENCE?

On the merits, the case appeared as follows: Mrs. Esco Broadus, with her husband, son of thirteen years, and daughter of fifteen months, on Sunday morning, April 23, 1961, went from their home, between Biloxi and Saucier, to Wiggins to visit a relative in the hospital. On the return trip, her husband stopped to visit his father, and she and the children drove on home. About an hour later, while the son was picking berries some distance away, Willie Wilson, at that time unknown to her, came to the back gate and inquired if someone was there who could give his car a pull. Mrs. Broadus told him that her husband would be home in a few minutes and he would give help. Appellant then asked for a drink of water, and she told him where the well was. She saw him apparently start back toward his car. Several minutes later, when she and her little daughter were in the den of the house, the door suddenly cracked open and there stood the appellant with an open knife in his hand. Immediately, in foul lan-

guage, he announced that he was there to have sexual intercourse with her and that he meant to do it. A struggle ensued. She fought and screamed and the baby screamed too. He said "What are you screaming for. I will kill you." He held a sharp pointed knife close to her heart. They struggled and fought all over the house until she was completely exhausted. Standing over her with the knife, he made her take off her pedal pushers and pants. Because of exhaustion and fear, she was compelled to submit to his forcible ravishment and sexual intercourse. It is unnecessary to chronicle the further details. Suffice it to say, this horrible experience, as narrated by the prosecutrix, made out a most aggravated type of felonious and forcible rape. Immediately upon the consummation, the defendant, still with the knife in hand, demanded money. Mrs. Broadus told him that she had no money because her husband had the billfold. She looked for her son's piggy bank at the place where it was usually kept but was not able to find it. When she finally located it, as she said, "The Negro had already set it out by the telephone." He took the bank, her son's radio, some watches, and a twenty-two rifle. After gagging and binding her, he left.

McArthur Moore, fourteen years of age, a cousin of Wilson, testified that he set out with Clifford Roundtree and the appellant that morning to go to the home of Johnny Moore, Jr. at McHenry. The appellant was driving his mother's car. They bought a half pint of liquor and each took a drink, but they did not drink all of the contents. They had passed some distance beyond the Broadus place when car trouble developed. The appellant told him and Roundtree to get some water. They went to the Broadus place and called, but no one answered. They then went to a pond, filled the jug with water, returned to the car and got in it. The witness went to sleep. The appellant woke him as he put

a twenty-two rifle, a radio, and a piggy bank in the car. After he did this, the appellant said that "the stuff was hot and they was liable to send him to the gas chamber." Shortly afterwards a car came along and pushed them off, but the car soon stopped again. At that time, the appellant opened the piggy bank, got the money, and threw the bank over the fence. He also threw some watches on the left side of the road and took off his shirt. In a short time, a highway patrolman stopped them. As the appellant saw the patrolman he said to Roundtree, "Clifford, I've got to kill him. With all this stuff he will send me to the gas chamber." Clifford said, "No, you ain't. Put that gun down." When the patrolman was getting out of his car, the appellant reached for the rifle, but Clifford made him put it down.

The recovered rifle, piggy bank, and radio were all identified by Mr. and Mrs. Broadus as property taken from the Broadus home at the time of the rape. Patrolman Dan Vernon, who made the arrest, saw the twenty-two rifle lying on the floor of the car at that time. He said that it was the same rifle which had been identified by the Broaduses.

The sole defense in this case was insanity.

Willie Mae Young, the appellant's grandmother, testified that he was born in Chicago, out of wedlock. He weighed four pounds and nine ounces. He lived with her practically all of his life, and was sickly until he was five or six years old. He attended school very little — went to some kind of training school — and they said they could not teach him anything. He can write his name, but is unable to read. He had a buzzing in his ear and convulsions until he was about eight years old. He was never normal like her children. He lied some. He would steal and fight. Lately he had been drinking. She thought he was weakened from the spells and did not know the difference between right and

wrong. On cross-examination, she said "I don't know where I would pronounce him crazy or not." After he got to be thirteen or fourteen years old, he began to steal. The authorities had him in Youth Court for stealing. She "got on him" and he said he was sorry, and that he would not do it anymore. On account of some other trouble, he was sent to the penitentiary for a year. He would always say that he was sorry after he did something wrong and that he did not know why he did it. After he got in this trouble, she went to see him and "bawled" him out. He told her he was sorry, and that he did not remember some of the things he did because he was drinking. He remembered getting some things, but "some thing they say I done, mamma, I don't know nothing about." As she talked to him, he told her not to break down. She said he was not crazy, that he was just nervous, and he looked then about as usual when he was frightened or nervous.

Mable Ann Kelly, the appellant's mother, testified that, as a child, he was queer. He was different from the other children and wanted to stay in the house and play by himself. She stated that, while he was employed at the R-C plant, he beat up a man, and lost his job; that he cut up a woman at Handsboro; that he lost his job at the Pepsi Cola Plant because of fighting; and that he hit a boy on the head with a jug of acid at Brooklyn. He also robbed her piggy bank. He would not apologize for what he did. It was her opinion that he is insane and has been that way all of his life, and that he did not know the difference between right and wrong. On cross-examination, she told about his sentence to the penitentiary, and that his wife had to go back to her people. She had let her little daughter go off in the car with him, and did not think he was crazy then. Neither did she think he was crazy when he married. She had never tried to commit him to an institution. She said that he was mean to her, to her

husband, to his little sister, to his grandmother, and to other folks. He would not listen to her or his grandmother. He would not mind. He would steal, take the money and have a good time with it, and run with the wrong crowd. She let him have her car on a Saturday to go to see his girl friend. She did not see it again until the following Wednesday, when the hose was pulled loose, the tires were flat, and the radio was gone. She said that he was mad with her because she called the police and told them where he was.

Dr. M. S. Love testified that, three or four years before this incident, he had treated the appellant for pneumonia, seeing him daily for a week. The only thing he noticed was that Wilson was of low mentality and did not associate events as well as one might. The witness was not a psychiatrist, and when asked whether, at the time he treated him, appellant knew right from wrong, he replied, "I would hesitate to give my opinion on a thing like that."

Dr. G. T. Sheffield, a well known and recognized psychiatrist who had been appointed by the court to examine the defendant, was called by the State in rebuttal. He observed the defendant during the sanity hearing and heard all of the witnesses testify. He also examined the accused privately for about thirty minutes. In addition to what he had seen and heard and his examination of the defendant, counsel for the State, by a hypothetical question, put before the doctor the substance of all of the testimony as to the life and conduct of the defendant, and inquired whether or not, at the time of the commission of the act of sexual intercourse, the defendant knew the difference between right and wrong, and the doctor answered "I think he knew right from wrong." On cross-examination, when counsel was trying to get the doctor to say that the defendant had a mental age of only five years, the doctor replied that the defendant "is up older than

that." The doctor pointed out that a premature and illegitimate birth has nothing to do with a man's development. Some are born prematurely and yet are brilliant. The appellant's account of what happened, namely, borrowing the car, sending the two for water, the details he went into regarding the act, his stealing, and what he said when he got back as to the articles being hot and they would send him to the gas chamber — all of this showed that he knew that he had done something wrong which might send him to the gas chamber.

Dan Vernon, one of the patrolmen, testified that the arrest was made about four or five miles from the Broadus home. He stopped his car about fifty feet from the approaching automobile, got out with a shotgun in his right hand, and held up his left as a signal to stop. The defendant, who was driving the car, indicated that he recognized the officer and stopped. He told the defendant to get out. The order was obeyed. Based on his observations from the time of the arrest until he was put in jail, the witness was of the opinion that the defendant was sane.

Under this point, the appellant argues that Dr. Sheffield's examination was not conducted for a sufficient time to exclude all reasonable doubt as to whether he knew the difference between right and wrong. In addition to the Mississippi statutes, the general law permits the court to call expert witnesses for the purpose of examining prisoners and testifying therefrom. 58 Am. Jur., Witnesses, Sec. 835, p. 468; Shipp v. State, 215 Miss. 541, 61 So. 2d 329; Rogers v. State, 222 Miss. 690, 76 So. 2d 831. In the Rogers case, supra, the two experts, under an order of the court, examined the accused for sanity on the day of the trial, and found no evidence thereof. Dr. Sheffield had examined the appellant, observed him during the first trial, and had heard all of the evidence relative to his sanity. It was

his opinion that the appellant knew right from wrong. Such contention of the appellant is therefore not well taken.

██ █ On the merits, the evidence amply sustained the verdict of the jury in finding the appellant guilty of forcible and felonious rape beyond a reasonable doubt.

██ █ On the question of insanity, the evidence in its entirety was sufficient to remove any reasonable doubt of the appellant's sanity, and to establish beyond reasonable doubt that he had the mental capacity to conduct a rational defense and that he knew the difference between right and wrong. As it was said by this Court in Singleton v. The State, 71 Miss. 782, 16 So. 295, "Nothing suggests a doubt of his sanity, unless it is the enormity of his crime, and it would be unsafe to indulge a presumption of a want of sanity from that * * *'' Cf. Rogers v. State, supra.

## ADMISSIBILITY OF EVIDENCE AS TO ARMED ROBBERY.

██ █ The defendant alone knew his purpose was in going to the Broadus home. After the rape, still in possession of the knife, he demanded money. According to Mrs. Broadus she was looking for the piggy bank where it was usually kept, but when she found it, it was located by the telephone. In other words, Wilson had apparently already found and taken the piggy bank before committing the rape. So, whether he went to the Broadus home to steal, or rob, or commit rape, or to do all of these things, is known only to him.

It must be remembered that only Mrs. Broadus testified as to the identity of the felon. In King v. State, 66 Miss. 502, 6 So. 188, the elemental rule was recognized that, in the trial of a criminal case, the testimony must be confined to the issue; and when the trial is for one offense, the prosecution cannot aid its proof by showing that the accused committed other offenses. But certain exceptions to the general rule were stated, to wit: "Where

the offense charged and that offered to be proved, *are so connected as to constitute but one transaction, or where it is necessary to identify the offender,* or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, *or where it is necessary to prove scienter or guilty knowledge, and the like* * * *"* (Emphasis supplied.)

In Raines v. State, 81 Miss. 489, 33 So. 19, it was stated that a previous crime, committed by the defendant, can be proved only "(a) where it is connected with the one charged in the indictment, and sheds light upon the motive of defendant; or, (b) where it forms a part of a chain of facts so intimately connected that the whole must be heard in order to interpret its several parts; or, (c) in cases of conspiracy, uttering forged instruments or counterfeit coin and receiving stolen goods, for the sole purpose of showing a criminal intention."

In Floyd v. State, 166 Miss. 15, 148 So. 226, it was said: "There are exceptions to the rule which has been stated, such as *where the offense charged and that offered to be proved are so connected as to constitute but one transaction, or where it is necessary to identify the offender,* or where it is material to prove motive, and there is apparent relation or connection between the act proposed to be proved and that charged, or where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge and the like." (Emphasis supplied.)

In Clark v. State, 181 Miss. 455, 180 So. 622, the admission of evidence as to other offenses was held proper "when it has a direct bearing on the question at issue, or where there is an apparent relation or con-

nection between the act proposed to be proved and that charged.''

In May v. State, 205 Miss. 295, 299, 38 So. 2d 726, the Court applied the rule that ''evidence of other crimes is incompetent except to show identity, guilty knowledge, intent or motive, or where the offense charged is so interwoven with other offenses that they cannot be separated.'' See also Bangren v. State, 198 Miss. 359, 22 So. 2d 360; Steele v. State, 213 Miss. 739, 57 So. 2d 574; Seid v. State, 226 Miss. 886, 85 So. 2d 585.

Shay v. State, 229 Miss. 186, 90 So. 2d 209, was a rape case. Shay had taken several articles, including a cigarette lighter, from the victim at the time of the commission of the crime. In holding that these articles were admissible, the Court said: ''These incidents were so connected as to constitute a continuous transaction. Besides the cigarette lighter was of distinct value in establishing the identity of the assailant. The rapist had a flashlight and a revolver at the time; and a flashlight and a revolver were taken from the accused. It was not error to admit this evidence'', citing authorities.

In Keel v. State, 133 Miss. 160, 97 So. 521, the evidence which was admitted concerning other crimes, formed a part of the res gestae, and, for that reason, it was held to be admissible.

The appellant says that the case of Dabney v. State, 82 Miss. 252, 33 So. 973, is authority for his contention that it was error to admit the evidence of the prosecutrix to the effect that he took the articles of property following the rape. In that case, the trial court, over the objection of the defendant, permitted a witness to testify that he lived in a room adjoining the prosecutrix and that his trunk was broken open and a suit of clothes was stolen therefrom by the defendant about the time the woman claimed to have been raped. This Court, on appeal, held that such evidence was inadmissible. The

opinion recognized certain exceptions to the rule, and said that such proof is competent where the different crimes are parts of the system of crimes and where one crime is shown to be intimately connected with another so as to furnish the motive for the commission of the crime charged. It picked out and stated exceptions to the rule as pointed out in Shaffner v. The Commonwealth, 72 Pa. 60, 13 Am. Rep. 649, and State v. Raymond, 53 N. J. Law 260, 21 Atl. 328. Those principles are in accord with the exceptions which were enumerated in King v. State and Floyd v. State, supra, as well as the other authorities heretofore stated. One exception announced in State v. Raymond, the New Jersey case, supra, not particularly emphasized in the King and Floyd cases, supra, is ''when one crime may have been perpetrated for, or as a means of committing, concealing, or escaping from another.'' .

In the above case, the larceny of the suit was of course evidence that Dabney was in the house about the time of the rape. However, that crime was committed against a different person than the rape victim. There was no evidence that the two crimes were interrelated, or that the theft was in any manner connected with the rape. On the contrary, the taking of the rifle, the piggy bank and the radio was evidence to establish the identity of the rapist. He had them in his possession when he returned to the car. After these articles were later obtained, they were strong corroboration of the charge of the prosecutrix. The rapist took these articles away — he had them in his possession a few minutes later — the rifle was actually recovered from him at the time of the arrest. Mrs. Broadus was the only person who could identify the rapist, and she had never seen him before. Corroboration is eagerly sought, especially in rape cases, and this evidence was admissible to show that both crimes were committed by the same person at the same time. The two offenses were com-

mitted in one transaction and cannot be dissociated one from the other. Besides, the taking of the rifle and the money can very well indicate that his object in so doing was to effectuate his escape from detection of the crime of rape.

The Court, in the Dabney case, supra, justified the exclusion on the ground that it was wholly unnecessary to admit the evidence for the purpose of identifying the accused, saying that "the other proof in the case abundantly identified the defendant." Such other evidence was not disclosed in the opinion. Be that as it may, this Court is of the opinion that the Dabney case has no application here. The other case of Skinner v. State, 198 Miss. 505, 28 So. 2d 501, involved offenses at different times and of course is inapplicable to the facts in this case.

From what has been said, the Court has concluded (1) that the trial court in no way erred in the manner in which it dealt with the requested bill of exceptions; (2) that the trial court properly overruled the motion to quash the indictment because the evidence wholly failed to show any discrimination in the selection of jurors; (3) that the verdict of the jury was not only not against the great weight of the evidence, but that the same was fully sustained by, and was in accordance with, the overwhelming weight of the evidence; and (4) that there was no error in the admission of the evidence of another crime which occurred at the same time when, and the same place where, the crime of rape was committed.

This record has been scrutinized with great care. It has been studied and thoroughly considered. The Court has been unable to find any prejudice or reversible error. The appellant was afforded a fair and impartial trial. His guilt was established beyond every reasonable doubt. The judgment must therefore be affirmed.

Affirmed; and Friday, May 11, 1962, is fixed as the date for the execution of the death penalty in the manner provided by law.

All Justices concur.